[915 NE2d 616, 886 NYS2d 671]

THE PEOPLE OF THE STATE OF NEW YORK, by ANDREW M. CUOMO, Attorney General of the State of New York, Respondent, v COVENTRY FIRST LLC et al., Appellants.

Argued June 3, 2009; decided June 30, 2009

## POINTS OF COUNSEL

*Williams & Connolly LLP* (*John G. Kester* and *Dane H. Butswinkas,* of the District of Columbia bar, admitted pro hac vice, of counsel), *Pillsbury Winthrop Shaw Pittman, LLP,* New York City (*E. Leo Milonas* and *Mark R. Hellerer* of counsel), and *Patterson Belknap Webb & Tyler LLP* (*Stephen P. Younger* and *Peter C. Harvey* of counsel), for appellants. I. The decision is contrary to the Federal Arbitration Act. (*Southland Corp. v Keating,* 465 US 1; *Moses H. Cone Memorial Hospital v Mercury Constr. Corp.,* 460 US 1; *Allied-Bruce Terminix Cos. v Dobson,* 513 US 265; *Matter of Americorp Sec. v Sager,* 239 AD2d 115; *Denney v BDO Seidman, L.L.P.,* 412 F3d 58; *Gilmer v Interstate/ Johnson Lane Corp.,* 500 US 20; *Shearson/American Express Inc. v McMahon,* 482 US 220; *Rodriguez de Quijas v Shearson/ American Express, Inc.,* 490 US 477; *Thomson-CSF, S.A. v American Arbitration Assn.,* 64 F3d 773; *Deloitte Noraudit A/S v Deloitte Haskins & Sells, U.S.,* 9 F3d 1060.) II. The complaint did not state a claim for aiding and abetting a breach of fiduciary duty. (*AHA Sales, Inc. v Creative Bath Prods., Inc.,* 58 AD3d 6; *Northeast Gen. Corp. v Wellington Adv.,* 82 NY2d 158; *Marmelstein v Kehillat New Hempstead: The Rav Aron Jofen Community Synagogue,* 11 NY3d 15; *Murphy v Kuhn,* 90 NY2d 266; *Hersch v DeWitt Stern Group, Inc.,* 43 AD3d 644; *Paull v First UNUM Life Ins. Co.,* 295 AD2d 982; *Hoffend & Sons, Inc. v Rose & Kiernan, Inc.,* 7 NY3d 152; *GlobalNet Financial.Com, Inc. v Frank Crystal & Co., Inc.,* 449 F3d 377; *People v Liberty Mut. Ins. Co.,* 52 AD3d 378; *Wender v Gilberg Agency,* 304 AD2d 311.)

*Andrew M. Cuomo, Attorney General,* New York City (*Benjamin N. Gutman, Barbara D. Underwood* and *Cecelia C. Chang* of counsel), for respondent. I. The State of New York is not required to arbitrate its claims for victim-specific relief. (*Matter of People v Applied Card Sys., Inc.,* 11 NY3d 105; *Fabiano v Philip Morris Inc.,* 54 AD3d 146; *Garrity v Lyle Stuart, Inc.,* 40 NY2d 354; *Sperry v Crompton Corp.,* 8 NY3d 204; *AT&T Technologies, Inc. v Communications Workers,* 475 US 643; *Matter of Fiveco, Inc. v Haber,* 11 NY3d 140, 801; *EEOC v Waffle House, Inc.,* 534 US 279; *Cap Gemini Ernst & Young, U.S., L.L.C. v Nackel,* 346 F3d 360; *Prima Paint Corp. v Flood & Conklin Mfg. Co.,* 388 US 395; *Volt Information Sciences, Inc. v*

*Board of Trustees of Leland Stanford Junior Univ.,* 489 US 468.) II. The complaint states a cause of action for knowingly inducing brokers to breach their fiduciary duty of loyalty. (*Arnav Indus., Inc. Retirement Trust v Brown, Raysman, Millstein, Felder & Steiner,* 96 NY2d 300; *EBC I, Inc. v Goldman, Sachs & Co.,* 5 NY3d 11; *Truong v Schwab & Co.,* 289 AD2d 98; *Sokoloff v Harriman Estates Dev. Corp.,* 96 NY2d 409; *Birnbaum v Birnbaum,* 73 NY2d 461; *Dubbs v Stribling & Assoc.,* 96 NY2d 337; *Baseball Off. of Commr. v Marsh & McLennan,* 295 AD2d 73; *Marmelstein v Kehillat New Hempstead: The Rav Aron Jofen Community Synagogue,* 11 NY3d 15; *Northeast Gen. Corp. v Wellington Adv.,* 82 NY2d 158; *Murphy v Kuhn,* 90 NY2d 266.)

## OPINION OF THE COURT

PIGOTT, J.

In recent years, an industry has developed in the United States in which investors, known as life settlement providers, buy life insurance policies from policy owners for cash, ultimately receiving the benefits of the policies when the insureds die. An example will illustrate the type of transaction involved. A company that holds a policy insuring the life of an executive who has retired wishes to sell the policy, to avoid paying premiums. A life settlement provider buys the life insurance policy from the company, for an amount exceeding the surrender value offered by the insurer, calculating that the value of the death benefits exceeds the purchase price, transaction costs, and continued premiums.*

Importantly, the life settlement industry purports to employ a competitive auction model. The policy owner—or the owner's financial advisor or agent—will often hire a broker to solicit competing bids for the policy from life settlement providers.

### I.

In October 2006, the Attorney General of New York State commenced this enforcement action against Coventry First LLC; its parent corporation, Montgomery Capital, Inc.; its executive vice-president, Reid S. Buerger; and an affiliate, The Coventry Group Inc. (collectively Coventry First), alleging fraudulent and

---

* Life settlement providers distinguish life settlements from viatical settlements, in which the policy seller suffers from a "catastrophic or life threatening illness or condition" (Insurance Law § 7801 [b]). The latter, but not the former, are regulated by Insurance Law article 78.

anticompetitive conduct. The Attorney General alleges that defendants, life settlement providers, engaged in bid-rigging by paying substantial, concealed commissions to life settlement brokers, who in return persuaded their clients to accept defendants' offers, rather than higher bids from rival life settlement providers. The Attorney General also claims that defendants concealed a scheme of "gross offers" whereby brokers were allowed to determine how much of a purchase price paid by defendants they would keep and how much they would pass on to the policy seller. Additionally, falsification of documents is alleged.

The Attorney General seeks damages "on behalf of the owners of life insurance policies who have been damaged by the schemes" and injunctive relief preventing further misconduct. The State's six causes of action are based on (1) Executive Law § 63 (12), (2) General Business Law § 340 *et seq.* (the Donnelly Act), (3) General Business Law § 352 *et seq.* (the Martin Act), (4) common-law fraud, (5) unjust enrichment, and (6) inducement of breach of fiduciary duty.

Defendants moved to dismiss plaintiff's complaint pursuant to CPLR 3211 (a) (7). In addition, because the contracts entered into by Coventry First and individual policy sellers contained paragraphs providing that contractual disputes and controversies between the parties would be settled by arbitration, defendants filed a motion pursuant to CPLR 7503 (a), seeking to "[c]ompel arbitration of all claims for victim-specific relief."

As relevant to this appeal, Supreme Court denied defendants' motion to compel arbitration and allowed the Attorney General's breach of fiduciary duty cause of action to proceed, along with two others (2007 NY Slip Op 33089[U]). The court also dismissed the Attorney General's claims to the extent that "they pertain to life settlement transactions that do not involve New York life settlement brokers, New York policy sellers, or alleged misconduct in New York" (*id.* at *12).

The Appellate Division reinstated the common-law fraud cause of action, dismissed by Supreme Court, and otherwise affirmed (52 AD3d 345 [2008]). The same court then granted leave to appeal to this Court, certifying the question whether Supreme Court's order, as modified by the Appellate Division, was properly made. We conclude that it was.

On appeal, defendants challenge the Appellate Division's decision in only two respects: insofar as it affirmed the denial of

their motion to compel arbitration and insofar as it allowed the Attorney General's sixth cause of action, alleging inducement of breach of fiduciary duty, to proceed. We address the arbitration question first.

## II.

While defendants concede that the State's injunctive claims are not susceptible to arbitration, they insist that the claims for relief specific to particular policy sellers—claims for rescission of purchase agreements and for restitution—are subject to arbitration under the sellers' contracts with Coventry First. We have "repeatedly recognized New York's 'long and strong public policy favoring arbitration' " (*Stark v Molod Spitz DeSantis & Stark, P.C.*, 9 NY3d 59, 66 [2007], quoting *Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39, 49 [1997]). However, the obligation to arbitrate depends on an *agreement* to arbitrate; arbitration "is a matter of consent, not coercion" (*Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith*, 85 NY2d 173, 182 [1995], quoting *Volt Information Sciences, Inc. v Board of Trustees of Leland Stanford Junior Univ.*, 489 US 468, 479 [1989]).

Consent to arbitrate occurs in the most straightforward manner when a party signs a formal agreement to arbitrate. The Attorney General, of course, did not enter into any contract with defendants, agreeing to arbitration. Instead, defendants argue that the Attorney General, by suing on behalf of policy sellers who contracted with Coventry First, has become the "agent or alter ego of the contracting sellers" and is bound by their obligation to arbitrate. They also argue that that obligation is enforceable against the Attorney General pursuant to the Federal Arbitration Act. It is true that courts apply common-law principles of contract and agency to determine whether a non-signatory is bound by an arbitration agreement. However, defendants' arguments fail in light of United States Supreme Court precedent.

In *EEOC v Waffle House, Inc.* (534 US 279 [2002]), the Supreme Court held that an agreement between an employer and an employee to arbitrate employment-related disputes does not bar the Equal Employment Opportunity Commission from seeking victim-specific relief, such as back pay, reinstatement, and damages, in an enforcement action alleging that the employer had violated the Americans with Disabilities Act. *Waffle House* stands for two broad propositions, applicable to

the present case. The first is that pro-arbitration policy goals do not require a government agency to give up its statutory enforcement authority in favor of arbitration if it has not consented to do so, because those goals do not "require parties to arbitrate when they have not agreed to do so" (534 US at 293, quoting *Volt*, 489 US at 478; *see* 534 US at 288-289, 293-294). The second is that the government agency may seek relief specific to a victim who agreed to arbitrate claims, because, as here, that relief is best understood as part of the vindication of a public interest (*see* 534 US at 294-296).

■ The Attorney General of New York State has statutory authority to serve the public interest by seeking both injunctive and victim-specific relief, comparable to that of the EEOC in the federal arena. The EEOC is authorized by statute to bring an enforcement action, seeking to enjoin an employer from engaging in unlawful employment practices and seeking appropriate affirmative action, such as reinstatement and/or back pay (42 USC § 2000e-5 [f] [1]; [g] [1]), as well as compensatory and punitive damages (42 USC § 1981a [a] [1], [2]; [d] [1] [A], [B]). Similarly, the Attorney General of New York State, when apprised of the persistent fraud or illegality of a business, is authorized by statute to bring an enforcement action seeking "an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, [and] directing restitution and damages" (Executive Law § 63 [12]). He is also authorized, when informed of deceptive acts or practices affecting consumers in New York, to "bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained" thereby (General Business Law § 349 [b]). Like the EEOC, the Attorney General should not be limited, in his duty to protect the public interest, by an arbitration agreement he did not join. Such an arrangement between private parties cannot alter the Attorney General's statutory role or the remedies that he is empowered to seek. We therefore hold that the arbitration agreement between defendants and their alleged victims does not bar the Attorney General from pursuing victim-specific judicial relief in his enforcement action.

### III.

We now turn to the issue of whether the Attorney General has pleaded a viable cause of action for inducement of breach of

fiduciary duty. The Attorney General claims that defendants "aided and abetted, participated in, and benefitted from" the life settlement brokers' breach of fiduciary duties to their clients.

"When assessing the adequacy of a complaint in light of a CPLR 3211 (a) (7) motion to dismiss, the court must afford the pleadings a liberal construction, accept the allegations of the complaint as true and provide plaintiff . . . the benefit of every possible favorable inference" (*AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 5 NY3d 582, 591 [2005] [internal quotation marks omitted]). "[O]ur sole criterion is whether the pleading states a cause of action, and if from its four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law a motion for dismissal will fail" (*Polonetsky v Better Homes Depot*, 97 NY2d 46, 54 [2001] [internal quotation marks omitted]). In determining whether the Attorney General's allegations are sufficient to state the necessary elements of a cognizable cause of action, we begin by noting that the claim that defendants knowingly induced or participated in a fiduciary's breach of obligations to another necessarily fails if no fiduciary duty exists or if defendants did not know of the duty.

Our first question therefore is whether the facts concerning life settlement brokers, as alleged by the Attorney General, fit within the legal theory of fiduciary duty. "A fiduciary relationship 'exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation' " (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005], quoting Restatement [Second] of Torts § 874, Comment *a*). It exists only when a person reposes a high level of confidence and reliance in another, who thereby exercises control and dominance over him (*see Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158, 172-173 [1993]).

According to the Attorney General, life settlement brokers hold themselves out as working to obtain the highest purchase price for their clients' policies. A promise to obtain for a client the "highest possible" offer—in contrast to, for example, simply "obtain[ing] requested coverage for [a client] within a reasonable time or inform[ing] the client of the inability to do so . . . [with] no continuing duty to advise, guide or direct a client to obtain additional coverage" (*Murphy v Kuhn*, 90 NY2d 266, 270 [1997] [citations

omitted])—would, if made in a manner that could be reasonably relied upon by the client, suggest a fiduciary duty. Here, the Attorney General's allegations describe a set of circumstances in which life settlement brokers, by claiming relationships with large numbers of other financial institutions and professionals, and by persistently representing that they seek the highest possible offer for their clients' life insurance policies, hold themselves out to be highly-skilled experts and are on notice that their advice is specially relied on by their clients. The sale of life insurance policies is alleged to be a relatively new and largely unregulated industry—one in which even sophisticated clients rely on what they take to be expert advice when seeking offers on policies they wish to sell. These allegations comport with the legal theory of fiduciary duty.

The Attorney General's allegations also sufficiently state a claim that defendants knew that the life settlement brokers' conduct constituted a breach of fiduciary duty. Defendants' only argument in this regard is that they could not have had the requisite knowledge because the present case was the first time that a fiduciary duty on the part of life settlement brokers had been announced in this jurisdiction. However, the Attorney General's complaint cited a Life Insurance Settlement Association White Paper, published in 2006, which states that the life settlement broker "has a fiduciary role to represent the seller by law . . . the bottom line is that the broker's job is to fully represent the interests of the policy seller." The complaint was also accompanied by an exhibit of e-mails between Coventry First executives who refer to the fiduciary duties of life settlement brokers. According the Attorney General the benefit of every possible favorable inference, as we must on a CPLR 3211 (a) (7) motion to dismiss, we conclude that he sufficiently alleged defendants' knowledge of the life insurance brokers' fiduciary duties.

## IV.

Finally, defendants' argument that the State does not have standing to bring a claim seeking damages on behalf of life insurance policy sellers was not preserved below and is waived under CPLR 3211 (e).

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

Judges CIPARICK, GRAFFEO, READ, SMITH and JONES concur; Chief Judge LIPPMAN taking no part.

Order affirmed, etc.