OPINION OF THE COURT
Gonzalez, EJ.
This appeal calls upon us to determine whether the regulations and guidelines implemented by the Office of Thrift Supervision (OTS) pursuant to the Home Owners’ Loan Act of 1933 (HOLA) (codified as 12 USC § 1461 et seq.) and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) (Pub L 101-73, 103 US Stat 183 [amending HOLA and codified in scattered sections of 12 USC]) preempt state regulations in the field of real estate appraisal.
The Attorney General claims that defendants engaged in fraudulent, deceptive and illegal business practices by allegedly permitting eAppraiselT residential real estate appraisers to be influenced by nonparty Washington Mutual, Inc. (WaMu) to increase real estate property values on appraisal reports in order to inflate home prices. We conclude that neither federal statutes nor the regulations and guidelines implemented by the OTS preclude the Attorney General of the State of New York from pursuing litigation against defendants First American Corporation and First American eAppraiselT, LLC. We further *71 conclude that the Attorney General has standing to pursue his claims pursuant to General Business Law § 349.
In a complaint dated November 1, 2007, plaintiff, the People of the State of New York, commenced this action against defendants asserting claims under Executive Law § 63 (12) and General Business Law § 349, and for unjust enrichment. The complaint alleges that in spring 2006, WaMu hired two appraisal management companies, defendant eAppraiselT and nonparty Lender’s Service, Inc., to oversee the appraisal process and provide a structural buffer against potential conflicts of interest between WaMu and the individual appraisers. The gravamen of the Attorney General’s complaint asserts that defendants misled their customers and the public by stating that eAppraiselT’s appraisals were independent evaluations of a property’s market value and that these appraisals were conducted in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP), when in fact defendants had implemented a system allowing WaMu’s loan origination staff to select appraisers who would improperly inflate a property’s market value to WaMu’s desired target loan amount.[1]
Defendants moved for dismissal of the complaint pursuant to CPLR 3211, asserting that the Attorney General is prohibited from litigating his claims because HOLA and FIRREA impliedly place the responsibility for oversight of appraisal management companies on the OTS, and asserting a failure to state a cause of action. Supreme Court denied defendants’ motion, finding that HOLA and FIRREA do not occupy the entire field with respect to real estate appraisal regulation and that the enforcement of USPAP standards under General Business Law § 349 neither conflicts with federal law nor does it impair a bank’s ability to lend and extend credit. We affirm.
The Supremacy Clause of the United States Constitution provides that federal laws “shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding” (US Const, art VI, cl 2) and it “vests in Congress the power to supersede not only State statutory or *72 regulatory law but common law as well” (Guice v Charles Schwab & Co., 89 NY2d 31, 39 [1996], cert denied 520 US 1118 [1997]). Indeed, “[u]nder the US Constitution’s Supremacy Clause (US Const, art VI, cl 2), the purpose of our preemption analysis is . . . ‘to ascertain the intent of Congress’ ” (Matter of People v Applied Card Sys., Inc., 11 NY3d 105, 113 [2008], cert denied sub nom. Cross Country Bank v New York, 555 US —, 129 S Ct 999 [2009]).
Congressional intent to preempt state law may be established “by express provision, by implication, or by a conflict between federal and state law” (Balbuena v IDR Realty LLC, 6 NY3d 338, 356 [2006], quoting New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co., 514 US 645, 654 [1995]). Express preemption occurs when Congress indicates its “pre-emptive intent through a statute’s express language or through its structure and purpose” (Altria Group, Inc. v Good, 555 US —, —, 129 S Ct 538, 543 [2008]). Absent explicit preemptive language, implied preemption occurs when
“[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it . . . [o]r the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject” (Rice v Santa Fe Elevator Corp., 331 US 218, 230 [1947]).
Further, when “[a] conflict occurs either because compliance with both federal and state regulations is a physical impossibility, or because the State law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” the state law is preempted (City of New York v Job-Lot Pushcart, 213 AD2d 210, 210 [1995], affd 88 NY2d 163 [1996], cert denied sub nom. JA-RU v City of New York, 519 US 871 [1996] [internal quotation marks and citations omitted]).
Here, defendants do not argue, nor have they directed this Court’s attention to any language within HOLA or FIRREA that establishes, that Congress expressly created these statutes to supersede state law governing the causes of actions asserted in the Attorney General’s complaint. Defendants also have not argued that there exists a conflict between federal and state laws or regulations. Rather, defendants assert that because Congress has legislated so comprehensively, and that federal law so completely occupies the home lending field, the Attorney *73 General is precluded from bringing claims against them under the theory of field preemption. Thus, the necessary starting point is to determine whether HOLA and FXRREA so occupy the field that these two statutes preempt any and all state laws speaking to the manner in which appraisal management companies provide real estate appraisal services.
In 1933, Congress enacted HOLA “to provide emergency relief with respect to home mortgage indebtedness at a time when as many as half of all home loans in the country were in default” (Fidelity Fed. Sav. & Loan Assn, v de la Cuesta, 458 US 141, 159 [1982] [internal quotation marks and citations omitted]). HOLA created a general framework to regulate federally chartered savings associations that left the regulatory details to the Federal Home Loan Bank Board (FHLBB). The FHLBB’s authority to regulate federal savings and loans was virtually unlimited and “[p]ursuant to this authorization, the [FHLBB] promulgated regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave” (id. at 145 [internal quotation marks and citation omitted]).
When Congress passed FXRREA in 1989, it restructured the regulation of the savings association industry by abolishing the FHLBB and vested many of its functions into the newly-created OTS (see FXRREA § 301, amending 12 USC § 1461 et seq. [establishing the OTS], § 401 [see 12 USCA § 1437 Historical and Statutory Notes (abolishing the FHLBB)]). According to FXRREA’s legislative history
“[t]he primary purposes of [FXRREA] are to provide affordable housing mortgage finance and housing opportunities for low- and moderate-income individuals through enhanced management of federal housing credit programs and resources; establish organizations and procedures to obtain and administer the necessary funding to resolve failed thrift cases and to dispose of the assets of these institutions; . . . and, enhance the regulatory enforcement powers of the depository institution regulatory agencies to protect against fraud, waste and insider abuse” (HR Rep 101-54[I], 101st Cong, 1st Sess, at 307-308, reprinted in 1989 US Code Cong & Admin News, at 103-104).
FXRREA was also designed
“to thwart real estate appraisal abuses . . . [by] *74 establishing] a system of uniform national real estate appraisal standards. It also requires the use of state certified or licensed appraisers for real estate related transactions with the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), the RTC, or certain real estate transaction [sic] regulated by the federal financial institution regulatory agencies” (HR Rep 101-54[I], 101st Cong, 1st Sess, at 311, reprinted in 1989 US Code Cong & Admin News, at 107).
Further, 12 USC § 3331, which was enacted as part of FIRREA, states that the general purpose of this statute is
“to provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision.”
The uniform standards described in 12 USC § 3331 are defined in 12 USC § 3339 which requires that the OTS, as a
“Federal financial institutions regulatory agency[,] . . . shall prescribe appropriate standards for the performance of real estate appraisals in connection with federally related transactions[2] under the jurisdiction of each such agency or instrumentality. These rules shall require, at a minimum—
“(1) that real estate appraisals be performed in accordance with generally accepted appraisal standards as evidenced by the appraisal standards promulgated by the Appraisal Standards Board of the Appraisal Foundation; and
“(2) that such appraisals shall be written appraisals.”
*75 The Appraisal Standards Board (ASB) of the Appraisal Foundation promulgates the appraisal standards mandated by 12 USC § 3339 which are called the Uniform Standards of Professional Appraisal Practice or USPAP. The Appraisal Foundation is a private “not-for-profit organization dedicated to the advancement of professional valuation [and] was established by the appraisal profession in the United States in 1987” (The Appraisal Foundation, Welcome to The Appraisal Foundation, https://netforum.avectra.com/eWeb/StartPage.aspx?Site=TAF [accessed May 27, 2010]). The ASB is responsible for “developing], interpreting] and amending]” USPAP (id.). However, “[e]ach U.S. State or Territory has a State appraiser regulatory agency, which is responsible for certifying and licensing real estate appraisers and supervising their appraisal-related activities, as required by Federal law” (State Regulatory Information, https ://netforum. avectra. com/eWeb/DynamicPage. aspx?Site= taf&WebCode=Regulatory!nfo [accessed May 27, 2010]; see also Appraisal Subcommittee, State Appraiser Regulatory Programs: State Contact Information, https://www.asc.gov/State-AppraiserRegulatory-Programs/StateContactlnformation.aspx [accessed May 27, 2010] [listing each state appraiser regulatory agency’s Web site]). Further, the OTS itself has determined that
“it does not appear that OTS is required by title XI of FIRREA to implement an appraisal regulation that reaches all the activities of savings and loan holding companies, at least to the extent that those activities are unrelated to the safety and soundness of savings associations or their subsidiaries. Neither the language of title XI nor its legislative history indicate that Congress intended title XI to apply to the wide range of activities engaged in by savings and loan holding companies and their non-savings association subsidiaries” (55 Fed Reg 34532, 34534-34535 [1990] [Supplementary Information on amendments to 12 CFR parts 506, 545, 563 and 571 and addition of 12 CFR part 564]).
Indeed, the OTS encourages financial institutions
“to make referrals directly to state appraiser regulatory authorities when a State licensed or certified appraiser violates USPAR applicable state law, or engages in other unethical or unprofessional conduct. Examiners finding evidence of unethical or *76 unprofessional conduct by appraisers will forward their findings and recommendations to their supervisory office for appropriate disposition and referral to the state, as necessary” (OTS, Thrift Bulletin, Interagency Appraisal and Evaluation Guidelines, at 10 [Nov. 4, 1994], http://files.ots.treas.gov/ 84042.pdf [accessed May 27, 2010]).
In looking at the legislative history it becomes clear that Congress intended to establish
“a system of uniform real estate appraisal standards and require [ ] the use of State certified and licensed appraisers for federally regulated transactions by July 1, 1991 . . .
“The key . . . lies in the creation of State regulatory agencies and a Federal watchdog to monitor the standards and to oversee State enforcement. . .
“It is this combination of Federal and State action . . . that . . . assur[es] . . . good standards are properly enforced” (135 Cong Rec S3993-01, S4004 [Apr. 17, 1989] [remarks of Senator Christopher J. Dodd]).
Thus, we conclude that neither HOLA nor FIRREA preempts or precludes the Attorney General from pursuing his claims.
Having rejected defendants’ general arguments for preemption under HOLA and FIRREA, “[t]he Court’s task, then, is to decide which claims fall on the regulatory side of the ledger and which, for want of a better term, fall on the common law side” (Cedeno v IndyMac Bancorp, Inc., 2008 WL 3992304, *7, 2008 US Dist LEXIS 65337, *22 [SD NY 2008] [internal quotation marks and citation omitted]). Defendants assert that the Attorney General is preempted from pursuing his claims because subsequent to FIRREA’s passage, the OTS issued extensive regulations specifically addressing the composition and construction of appraisal programs undertaken by federal savings and loans.
It is well settled that “[a]gencies delegated rulemaking authority under a statute . . . are afforded generous leeway by the courts in interpreting the statute they are entrusted to administer” (Rapanos v United States, 547 US 715, 758 [2006, Roberts, Ch. J., concurring]). Indeed, the OTS regulations “have no less pre-emptive effect than federal statutes” (Fidelity Fed. Sav. & Loan Assn., 458 US at 153). 12 CFR 545.2 states that *77 regulations promulgated by the OTS are “preemptive of any state law purporting to address the subject of the operations of a Federal savings association.” However, 12 CFR 560.2 (a) limits the language of 12 CFR 545.2 by setting parameters to the OTS’s authority to promulgate regulations that
“preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA.”
12 CFR 560.2 (b) provides a nonexhaustive list of illustrative examples of the types of state laws preempted by 12 CFR 560.2 (a). Further, 12 CFR 560.2 (c) states that the following types of state laws are not preempted
“to the extent that they only incidentally affect the lending operations of Federal savings associations
“(1) Contract and commercial law;
“(2) Real property law;
“(3) Homestead laws specified in 12 U.S.C. 1462a
(f);
“(4) Tort law;
“(5) Criminal law; and
“(6) Any other law that OTS, upon review, finds:
“(i) Furthers a vital state interest; and
“(ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.” The OTS advises that when a court is
“analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it *78 does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption” (61 Fed Reg 50951-01, 50966-50967 [1996]).
Defendants argue that the Attorney General’s challenges to defendants’ business practices are preempted because the conduct falls within 12 CFR 560.2 (b) (5), which provides examples of loan-related fees “including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees.” Defendants also assert that their alleged conduct is within 12 CFR 560.2 (b) (9), which provides “[d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants.” Lastly, defendants assert that their alleged conduct falls within 12 CFR 560.2 (b) (10), which states that “[processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages” is preempted.
The Attorney General’s complaint asserts that defendants engaged in conduct proscribed by Executive Law § 63 (12)[3] and General Business Law § 349.[4] It further alleges that defendants unjustly enriched themselves by repeated use of fraudulent or illegal business practices, in that they allowed WaMu to pres *79 sure eAppraiselT appraisers to compromise their USPAPrequired independence and collude with WaMu to inflate residential appraisal values so that the appraisals would match the qualifying loan values WaMu desired.
Under the first prong of the preemption analysis, we find that this action brought pursuant to Executive Law § 63 (12), General Business Law § 349 (b) and on the theory of unjust enrichment is not preempted by 12 CFR 560.2 (b) (5) because it involves no attempt to regulate bank-related fees. We also find, under the first prong of the preemption analysis, that there is no preemption pursuant to 12 CFR 560.2 (b) (9) because these claims do not involve a state law seeking to impose or require any specific statements, information or other content to be disclosed. Although at least one case has held that claims similar to those asserted here were preempted (see Spears v Washington Mut., Inc., 2009 WL 605835, 2009 US Dist LEXIS 21646 [ND Cal 2009]), we find under the first prong of the preemption analysis that 12 CFR 560.2 (b) (10) does not preclude the Attorney General’s complaint because prosecution of the alleged conduct will not affect the operations of federal savings associations (FSAs) in how they process, originate, service, sell or purchase, or invest or participate in, mortgages.
The question then becomes whether the Attorney General is nevertheless precluded from litigating his claims under the second prong of the preemption analysis. Because enjoining a real estate appraisal management company from abdicating its publicly advertised role of providing unbiased valuations is within the confines of 12 CFR 560.2 (c), we answer it in the negative.
Defendants argue that the OTS’s authority under HOLA and FIRREA is not limited to oversight of an FSA and that its authority under these two statutes extends over the activity regulated and includes the activities of third-party agents of an FSA. Defendants assert that providing real estate appraisal services is a critical component of the processing and origination of mortgages and represents a core component of the controlling federal regime. Defendants cite 12 USC § 1464 (d) (7) (D) and State Farm Bank v Reardon (539 F3d 336 [6th Cir 2008]) for support. 12 USC § 1464 (d) (7) (D) (i) states, in pertinent part, that
“if a savings association . . . causes to be performed for itself, by contract or otherwise, any service authorized under [HOLA] . . . *80 “such performance shall be subject to regulation and examination by the [OTS] Director to the same extent as if such services were being performed, by the savings association on its own premises.”
Here, it is alleged eAppraiselT and Lender’s Service, Inc., were hired by WaMu to provide appraisal services. However, defendants are incorrect in asserting that providing real estate appraisal services is an authorized banking activity under HOLA. In an opinion letter dated October 25, 2004, the OTS concluded that it had the authority to regulate agents of an FSA under HOLA because
“[i]nherent in the authority of federal savings associations to exercise their deposit and lending powers and to conduct deposit, lending, and other banking activities is the authority to advertise, market, and solicit customers, and to make the public aware of the banking products and services associations offer. The authority to conduct deposit and lending activities, and to offer banking products and services, is accompanied by the power to advertise, market, and solicit customers for such products and services ... A state may not put operational restraints on a federal savings association’s ability to offer an authorized product or service by restricting the association’s ability to market its products and services and reach potential customers . . .
“Thus, OTS has authority under the HOLA to regulate the Agents the Association uses to perform marketing, solicitation, and customer service activities” (2004 OTS Op P-2004-7, at 7, http:// files.ots.treas.govZ560404.pdf [accessed May 27, 2010], 2004 WL 3272094, *4-5, 2004 OTS LEXIS 6, *15-16).
State Farm Bank v Reardon (539 F3d 336 [2008]) follows this principle. In Reardon, the plaintiff, an FSA chartered by the OTS under HOLA, decided to offer, through its independent contractor agents, first and second mortgages and home equity loans in the State of Ohio. The Sixth Circuit concluded that although the statute at issue
“directly regulates [the plaintiff FSA’s] exclusive agents rather than [the FSA] itself . . . the activity being regulated is the solicitation and origination of *81 mortgages, a power granted to [the FSA] by HOLA and the OTS. This is also a power which the OTS has indicated that any state attempts to regulate will be met with preemption . . „ [T]he practical effect of the [statute] is that [the FSA] must either change its structure or forgo mortgage lending in Ohio. Thus, enforcement of the [statute] against [(the FSA’s) exclusive agents] would frustrate the purpose of the HOLA and the OTS regulations because it indirectly prohibits [the FSA] from exercising the powers granted to it under the HOLA and the OTS regulations” {Reardon, 539 F3d at 349 [internal quotation marks and citation omitted]).
Since appraisal services are not authorized banking products or services of an FSA, defendants have failed to show that the Attorney General is preempted from pursuing his claims under 12 USC § 1464 (d) (7) (D); Consequently, under the second prong of the preemption analysis, the result of the Attorney General litigating his claims against a company that independently administers an FSA’s appraisal program would “only incidentally affect the lending operations of [the FSA]” (12 CFR 560.2 [c]). Thus, defendants have failed to show that the OTS’s regulations and guidelines preempt or preclude the Attorney General from pursuing his claims.
Defendants assert that Cedeno v IndyMac Bancorp, Inc. (2008 WL 3992304, 2008 US Dist LEXIS 65337 [2008]) provides this Court with persuasive authority that the federal government and its regulators alone regulate the mortgage loan origination practices of FSAs including all aspects of the appraisal programs they utilize. In Cedeno, the Southern District found preemption precluded a private individual from maintaining a cause of action against a bank. It was alleged that the bank failed to disclose to the plaintiff that it selected appraisers, appraisal companies and/or appraisal management firms who would inflate the value of residential properties in order to allow the bank to complete more real estate transactions and obtain greater profits. This practice resulted in the plaintiff being misled as to the true equity in her home. The Southern District found that the conduct of the bank was
“directly regulated by the OTS: the processing and origination of mortgages, a loan-related fee, and the accompanying disclosure. The appraisals are a prerequisite to the lending process, and are inextricably *82 bound to it. Because the plaintiffs claim is not a simple breach of contract claim, but asks the Court to set substantive standards for the Associations’ lending operations and practices, it is preempted” 0Cedeno, 2008 WL 3992304 at *9, 2008 US Dist LEXIS 65337 at *28 [internal quotation marks and citations omitted]).
Contrary to defendants’ assertions, we find that Cedeno is not applicable here because Cedeno does not reach the question as to whether HOLA, FIRREA or the OTS’s regulations and guidelines are intended to regulate the conduct of real estate appraisal companies.
Annexed to the OTS’s October 25, 2004 opinion letter is a document entitled “APPENDIX A - CONDITIONS.” In this document, the OTS requires FSAs that wish to use agents to perform marketing, solicitation, customer service, or other activities related to the FSAs’ authorized banking products or services to enter into written agreements that “(4) expressly set[ ] forth OTS’s statutory authority to regulate and examine and take an enforcement action against the agent with respect to the activities it performs for the association, and the agent’s acknowledgment of OTS’s authority” (2004 OTS Op P-2004-7, at 16, available at http://www.ots.treas.gov/_files/560404.pdf, 2004 WL 3272094, *11, 2004 OTS LEXIS 6, *37 ). We note that defendants have neither asserted that such written agreements exist nor produced such documents. Thus, we conclude that the Attorney General may proceed with his claims against defendants because his challenge to defendants’ allegedly fraudulent and deceptive business practices in providing appraisal services is not preempted by federal law and regulations that govern the operations of savings and loan associations and institution-affiliated parties.
Defendants assert that the Attorney General cannot rely upon a substantive violation of a federal law to support a claim under General Business Law § 349 because this is an improper attempt to convert alleged violations of federal law into a violation of New York law. Defendants claim that where a plaintiff seeks to rely upon a substantive violation of a federal law to support a claim under General Business Law § 349, the federal law relied upon must contain a private right of action.
However, the Attorney General is statutorily charged with the duty to
“[p]rosecute and defend all actions and proceedings *83 in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interest of the state” (Executive Law § 63 [1]).
Indeed, when the Attorney General becomes aware of allegations of persistent fraud or illegality of a business, he
“is authorized by statute to bring an enforcement action seeking ‘an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, [and] directing restitution and damages’ (Executive Law § 63 [12]). He is also authorized, when informed of deceptive acts or practices affecting consumers in New York, to ‘bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained’ thereby (General Business Law § 349 [b])” (People v Coventry First LLC, 13 NY3d 108, 114 [2009]).
It is well settled that “[o]n a motion to dismiss pursuant to CPLR 3211, the court must ‘accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory’ ” (Wiesen v New York Univ., 304 AD2d 459, 460 [2003], quoting Leon v Martinez, 84 NY2d 83, 87-88 [1994]). The Attorney General’s complaint alleges that defendants publicly claimed on their eAppraiselT Web site that eAppraiselT provides a firewall between lenders and appraisers so that customers can be assured that USPAP and FIRREA guidelines are followed and that each appraisal is being audited for compliance. The Attorney General charges that defendants deceived borrowers and investors who relied on their proclaimed independence by allowing WaMu’s loan production staff to select the appraiser based upon whether they would provide high values.
We find defendants’ assertions that the Attorney General lacks standing under General Business Law § 349 and that his complaint fails to state a cause of action are without merit. Indeed, the Attorney General’s complaint references misrepresentations and other deceptive conduct allegedly perpetrated on the consuming public within the State of New York, and “[a]s *84 shown by its language and background, section 349 is directed at wrongs against the consuming public” (Oswego Laborers’ Local 214 Pension Fund v Marine Midland Bank, 85 NY2d 20, 24 [1995]). Therefore, we find that the Attorney General’s complaint articulates a viable cause of action under General Business Law § 349, and that this statute provides him with standing.
Consequently, we conclude that defendants have failed to demonstrate that HOLA, PIRREA or the OTS’s regulations and guidelines preempt or preclude the Attorney General from pursuing the causes of action articulated in his complaint. We additionally find that the Attorney General has standing under General Business Law § 349. We have reviewed defendants’ remaining contentions and we find them without merit.
Accordingly, the order of the Supreme Court, New York County (Charles Edward Ramos, J.), entered April 8, 2009, which, insofar as appealed from as limited by the briefs, denied defendants’ motion to dismiss the complaint on the ground of federal preemption, should be affirmed, without costs.
Saxe, Catterson and Acosta, JJ., concur.
Order, Supreme Court, New York County, entered April 8, 2009, affirmed, without costs.

. USPAP is incorporated into New York law and it prohibits a State-certified or State-licensed appraiser from accepting a fee for an appraisal assignment “that is contingent upon the appraiser reporting a predetermined estimate, analysis, or opinion or is contingent upon the opinion, conclusion or valuation reached, or upon the consequences resulting from the appraisal assignment” (Executive Law § 160-y [1]; 19 NYCRR 1106.1).

. 12 USC § 3350 (4) states that
“[t]he term ‘federally related transaction’ means any real estate-related financial transaction which—
“(A) a federal financial institutions regulatory agency or the Resolution Trust Corporation engages in, contracts for, or regulates; and
“(B) requires the services of an appraiser.”

. Executive Law § 63 (12) states, in pertinent part, that “[wlhenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, . . . for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages.”

. General Business Law § 349 (b) states, in pertinent part, that “[wlhenever the attorney general shall believe from evidence satisfactory to him that any person, firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful he may bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices.”