[9 NYS3d 201]

John Seward Johnson, Jr., et al., Respondents-Appellants, v Proskauer Rose LLP et al., Appellants-Respondents, et al., Defendant.

First Department, April 30, 2015

**APPEARANCES OF COUNSEL**

*Proskauer Rose LLP*, New York City (*David M. Lederkramer, Elise A. Yablonski* and *Andrew S. Wellin* of counsel), for appellants-respondents.

*Pashman Stein P.C.*, Hackensack, New Jersey (*Gary S. Stein* of the New Jersey bar, admitted pro hac vice, of counsel), *Pashman Stein P.C.*, New York City (*Sean Mack* of counsel), and *Baratta, Baratta & Aidala LLP*, New York City (*Ottavio V. Mannarino, Joseph P. Baratta* and *Louis R. Aidala* of counsel), for respondents-appellants.

MAZZARELLI, J.

On this appeal and cross appeal from the disposition of a motion addressed to the allegations in plaintiffs' first amended complaint, the following recitation of facts is based strictly on the allegations set forth in that pleading. As this is a motion to dismiss the complaint, the allegations must be assumed to be true. Plaintiffs are individual heirs to the Johnson & Johnson (J & J) fortune, trusts established for the benefit of those individuals, and trustees of the plaintiff trusts. They own many shares of J & J stock, much of it obtained at a low cost basis. One of the trustee plaintiffs, Robert Matthews, is also a certified public accountant who prepared the tax returns that were challenged by the IRS and give rise to this dispute. Defendant Proskauer Rose LLP (Proskauer) is a law firm that, prior to the events at issue, had represented plaintiffs on a variety of matters, including tax matters. Defendant Jay Waxenberg is a member of Proskauer.

Although plaintiffs had not expressed to anyone at Proskauer that they desired to sell J & J stock, Waxenberg telephoned Matthews several times in September 2000 to discuss a method which, he told Matthews, would permit plaintiffs to sell J & J stock without being subject to a large tax liability. Plaintiffs agreed to hear more about the proposal, and on October 2, 2000, plaintiff John Seward Johnson, Jr. and Matthews met Waxenberg and his partner, defendant Ira Akselrad, at Proskauer's offices. At the meeting, Waxenberg and Akselrad introduced Johnson and Matthews to James Haber, who was identified as a principal of The Diversified Group, Inc. (TDG). Haber explained to Johnson and Matthews that TDG was in the business of developing tax minimization strategies for individuals and families with high net worths.

Haber, Waxenberg and Akselrad then described to Johnson and Matthews the specific scheme they believed would benefit plaintiffs, and instructed them how to execute it. They represented to Johnson and Matthews that the plan would obviate plaintiffs' need to pay tax on the gains realized by the sale of J & J stock and would withstand IRS scrutiny since it had "a legitimate and bona fide business and economic purpose." Waxenberg and Akselrad stated that, at a later date, Proskauer would prepare and issue to plaintiffs an opinion letter explaining the legal rationale supporting the scheme, and which would protect plaintiffs from the imposition of any penalties in the

"unlikely" event the IRS disagreed with defendants' opinion that the strategy was a legitimate one. They also told Johnson and Matthews that after the plan was implemented, they would continue to represent plaintiffs in connection with it. In the meantime, however, even though Johnson and Matthews told them that they were in no rush to sell J & J stock, Waxenberg and Akselrad told Johnson and Matthews that they should execute the strategy in the very near future, and would be "foolish" not to. This, Waxenberg and Akselrad said, was because plaintiffs' opportunity to do so may not be open-ended, because it was being offered to them as favored clients of Proskauer, and because other similarly-situated clients, including members of the Johnson family, had already done so. Finally, Akselrad and Waxenberg told Johnson and Matthews not to discuss the tax avoidance plan with anybody else.

Also on October 2, 2000, Johnson and Matthews executed a retainer letter that provided, inter alia, that Proskauer would render tax advice to plaintiffs regarding the discussed sale of J & J stock, that Proskauer had represented TDG in the past on "unrelated matters," that plaintiffs had agreed that Proskauer would "continue to represent TDG fully in unrelated matters notwithstanding [its] ongoing representation of [plaintiffs]," and that plaintiffs had waived "any conflict of interest" arising in connection with Proskauer's representation of TDG "in unrelated matters notwithstanding [its] ongoing representation of [plaintiffs]."

Between October 13, 2000 and November 30, 2000, plaintiffs took the complex series of steps recommended by TDG and Proskauer to effectuate the tax strategy. They paid TDG a total of $1,379,650 in fees and costs, of which they allege that $425,000 was paid by TDG to Proskauer to cover its legal fee.

In June 2001, Proskauer sent plaintiffs a 63-page opinion letter, dated December 29, 2000, which concluded that "it was more likely than not" that the scheme, already executed, would not generate any gain or loss, or accrue any penalties if it was disallowed by the IRS.

In January 2002, the IRS announced a tax amnesty program which allegedly would have been applicable to plaintiffs' situation. However, Proskauer did not notify plaintiffs of that program. In April 2006, the IRS sent plaintiffs a letter requesting documents and detailed information about the tax avoidance strategy they had implemented over five years earlier. Plaintiffs sought counsel from Waxenberg, but he informed

them that Proskauer was conflicted by its representation of TDG. Concerned that the agency would ultimately challenge the scheme and assess penalties against them, plaintiffs secured a tolling agreement from Proskauer which, after a later extension, tolled the statute of limitations for any claims against Proskauer up to and including July 31, 2011. Ultimately, the IRS ruled the shelter transaction was not entitled to favorable capital gains tax treatment and assessed plaintiffs back taxes, penalties and interest amounting to millions of dollars.

In December 2010, plaintiffs became aware of a decision in a federal case in Massachusetts District Court (*Fidelity Intl. Currency Advisor A Fund, LLC, by Tax Matters Partner v United States*, 747 F Supp 2d 49 [D Mass 2010]). That case was brought by a former Proskauer client who had executed a tax avoidance plan similar to that recommended to plaintiffs by Proskauer and Akselrad. The District Court, after a 44-day trial, issued findings of fact and conclusions of law which stated that the attorneys "agreed in advance to provide favorable legal opinions in order to induce taxpayer-investor" to get involved in the shelter opportunity, and that Proskauer and another law firm had "derived substantial profit from the promotion and sale of the tax shelter strategy, and therefore had a financial interest in upholding the strategy" (747 F Supp 2d at 212, 213).

In July 2011, plaintiffs commenced this action against defendants. Plaintiffs asserted causes of action against defendants sounding in fraud, legal malpractice and unjust enrichment; they also sought a declaratory judgment in their favor and recovery of legal fees, which they claimed were grossly excessive. The fraud claim was supported by the allegations that, at the October 2000 meeting, Waxenberg and Akselrad made affirmative statements touting a tax avoidance plan that they had no genuine basis to represent would be an effective one, as well as their failure to apprise plaintiffs of the fact that Proskauer was effectively in a business partnership with TDG and had a direct financial interest in plaintiffs' purchasing the services being offered by TDG. Plaintiffs claim that the fraud was widespread, since, they allege, Proskauer issued 380 opinion letters to other clients, similar to the one they received, discussing TDG tax avoidance strategies. In connection with the fraud cause of action, plaintiffs sought, inter alia, the taxes, penalties and interest to be assessed by the IRS, and dividend

income and appreciation sacrificed by their decision to sell J & J stock at the urging of defendants. Plaintiffs also sought punitive damages based on defendants' alleged "conscious, willful and wanton disregard of the rights" of plaintiffs, which was "directed at members of the public, to generate unwarranted and excessive fees."

Proskauer and Waxenberg jointly moved to dismiss plaintiffs' first amended verified complaint, arguing, as is relevant here, that the legal malpractice claim was time-barred before the tolling agreement was executed and that the other substantive claims must be similarly barred based on the duplicative claims doctrine codified in CPLR 214 (6). They further posited that, on the merits, the fraud claim must fail because plaintiffs could not have justifiably relied on any of the representations or omissions attributed to defendants, given plaintiffs' relative sophistication and the fact that the opinion letter advised that it was merely "more likely than not" that the scheme would pass IRS muster. Finally, defendants asserted that, even were the fraud claim to survive, it did not give rise to a claim for punitive damages.

Plaintiffs argued in opposition to the motion that the continuing representation doctrine tolled the accrual of their malpractice claim until at least April 2006, which was when Proskauer affirmatively informed them that it could not represent them with respect to the tax avoidance plan. They further argued that the fraud and malpractice claims were not duplicative because they rested on different allegations and sought different damages.

The court denied defendants' motion, except to the extent it sought dismissal of the causes of action for legal malpractice and declaratory relief. With respect to the malpractice claim, it found that the opinion letter expressly disclaimed any obligation by defendants to "update" the opinion, notwithstanding a change in the law or facts, and that no other events served to extend the accrual of the limitations period (2014 NY Slip Op 30262[U], *26 [2014]). The court rejected plaintiffs' continuous representation argument, noting there were no allegations that plaintiffs required any form of representation from Proskauer on the shelter transaction between June 2001, when they received the opinion letter, and 2006, and that any alleged general understanding of a "standby," "ongoing representation," in the event IRS inquiries arose, did not amount to continuous representation (id. at *26, *28). The court stated that plaintiffs'

allegation that Proskauer represented that it was unlikely that the IRS would challenge the tax strategy undermined their continuous treatment argument, because it indicated that they had no acute awareness of the need for further representation on the matter.

The court declined to dismiss plaintiffs' fraud claim as duplicative of the legal malpractice claim, since the former claim was founded upon allegations indicating something more than mere concealment of malpractice. The court found the fraud claim alleged independent, intentionally tortious conduct, particularly concerning Proskauer's failure to disclose its true relationship with TDG, and that such conduct allegedly gave rise to separate and distinct damages from the malpractice claim. The court noted that plaintiffs alleged that Proskauer intentionally made false representations as to the legality of the shelter transaction, as well as to the nature of its relationship with TDG regarding the tax shelter transactions. The court further noted that plaintiffs alleged that Proskauer participated in a broader fraudulent scheme with TDG to target numerous wealthy clients.

The court similarly declined to dismiss the claim alleging that Proskauer's fee was excessive, since this claim too was distinct from the legal malpractice claim inasmuch as it did not relate to the quality or content of defendants' legal advice to plaintiffs. The court credited allegations that Proskauer had issued approximately 380 other opinion letters confirming the legality of the tax avoidance plan, and that the fee appeared to be a disguised finder's fee, or commission. For similar reasons, the court declined to dismiss plaintiffs' fifth cause of action for unjust enrichment, as it was predicated upon the same excessive fee claim, and was thus not duplicative of the legal malpractice arguments.

The motion court rejected Proskauer's argument that the allegations did not support the justifiable reliance element of a fraud claim. It recognized that plaintiffs acknowledged the opinion letter only went so far as to state that "it [was] more likely than not" that the shelter transaction was legal (*id.* at *15). However, it held that because plaintiffs did not receive the opinion letter until after they entered the shelter transaction, they had adequately stated a basis for justifiable reliance upon Proskauer's much more favorable assessment of the shelter transaction at the October 2000 meeting.

The court declined to dismiss plaintiffs' punitive damages claim. It credited their allegations that defendants participated

in a scheme that targeted hundreds of clients, notwithstanding their fiduciary duty to those clients, and that they did so strictly in the pursuit of profits and without full disclosure of the nature of their relationship to TDG. It did dismiss plaintiffs' cause of action seeking a declaration of "the rights and legal relations" of the parties, including that defendants were liable to plaintiffs for the resulting taxes, penalties, interest and legal fees, finding that plaintiffs had an adequate remedy at law under the other causes of action alleged in the complaint.

Because these appeals arise out of a motion brought pursuant to CPLR 3211, our analysis of plaintiffs' claims is limited to the four corners of the pleading, the allegations of which we must give a liberal construction and accept as true (*see Leon v Martinez*, 84 NY2d 83, 87-88 [1994]). We must also accord plaintiffs the benefit of every possible favorable inference (*id.*) and bear in mind that "[w]hether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). These guidelines apply not only to a motion to dismiss for failure to state a cause of action under CPLR 3211 (a) (7), but also to dismiss based on the statute of limitations pursuant to CPLR 3211 (a) (5) (*New York Tel. Co. v Mobil Oil Corp.*, 99 AD2d 185, 192 [1st Dept 1984]).

Plaintiffs do not dispute that, ordinarily, a legal malpractice claim accrues when the injury to the client occurs, regardless of the client's awareness of the malpractice (*see Goldman v Akin Gump Strauss Hauer & Feld LLP*, 46 AD3d 481 [1st Dept 2007], *lv dismissed in part, denied in part* 11 NY3d 749 [2008]). According to that principle of law, the statute of limitations would have begun to run, at the latest, on June 8, 2001, when Proskauer delivered the opinion letter. Plaintiffs argue that the continuous representation doctrine tolled the limitations period. That doctrine "appreciates the client's dilemma if required to sue the attorney while the latter's representation on the matter at issue is ongoing" (*Shumsky v Eisenstein*, 96 NY2d 164, 167 [2001]). However, the tolling it allows only applies to the specific matter out of which the malpractice claim arises; it does not apply merely because the lawyer and client had a continuing relationship pursuant to which they would have occasion to deal with each other from time to time (*id.* at 168).

Plaintiffs contend that their retainer agreement with Proskauer establishes continuous representation since it

preserved the firm's right to represent TDG "in unrelated matters notwithstanding [its] *ongoing representation* of [plaintiffs]" (emphasis added). However, what controls is not what a retainer agreement might say, but rather whether a client is "acutely aware of [the] need for further representation on the specific subject matter underlying the malpractice claim" (*Shumsky* at 169). In *Shumsky*, the retainer agreement supported the plaintiffs continuous representation argument where it made specific reference to the action they had retained the attorney to commence and prosecute. Thus, the Court of Appeals deemed the representation to be continuous until such time as the plaintiffs should have realized that the attorney had implicitly withdrawn from representation by refusing to return their telephone calls seeking to ascertain the status of the action. Here, the retainer agreement is distinguishable from the agreement in *Shumsky* because, notwithstanding the "ongoing representation" language, there was no concrete task defendants were likely to perform after they delivered the opinion letter. Accordingly, while there was certainly the *possibility* that the need for future legal work would be required with respect to the tax strategy, plaintiffs could not have "acutely" anticipated the need for further counsel from defendants that would trigger the continuous representation toll.

Defendants argue that, because the legal malpractice claim is time-barred, plaintiffs' other claims arising out of the representation are also time-barred since they are merely duplicative of the malpractice cause of action. This contention derives from CPLR 214 (6), which was enacted to prevent plaintiffs from circumventing the three-year statute of limitations for professional malpractice claims by characterizing a defendant's failure to meet professional standards as something else, such as a breach of contract (for which there is a six-year statute of limitations) (*see Matter of R.M. Kliment & Frances Halsband, Architects [McKinsey & Co., Inc.]*, 3 NY3d 538, 541-542 [2004]). The key to determining whether a claim is duplicative of one for malpractice is discerning the essence of each claim (*see id.* at 542; *Spinale v Tenzer Greenblatt*, 309 AD2d 632 [1st Dept 2003]). Thus, in *Kliment*, a breach of contract claim against an architect was barred because it merely sought to enforce a provision in an agreement that required the architect to prepare its plans in accordance with law, and failure to do so would have been the same as failing to carry out its professional obligations.

On the other hand, a fraud claim survived dismissal of an accounting malpractice cause of action in *Mitschele v Schultz* (36 AD3d 249 [1st Dept 2006]). There, the defendant accounting firm was recommended to the plaintiff by her employer. The plaintiff asserted that the defendant committed numerous errors in preparing and filing her tax returns. She also alleged that the defendant had represented to her that the manner in which it declared her earnings was "the way it's got to be," and that it insisted on the particular course of action not with her own interests in mind, but those of her employer, which was seeking to minimize its own tax liability. This Court held that

> "defendants' alleged fraud is not simply the failure to disclose the malpractice based upon accounting errors. Rather, defendants are alleged to have perpetrated a fraud on plaintiff *from the time they were retained* to provide accounting services, in failing to disclose their concern with protecting the interests of another entity, namely, plaintiff's employer" (36 AD3d at 254 [emphasis added]).

Thus, in *Mitschele*, the fraud claim was considered independent of the malpractice claim for statute of limitations purposes even though the harm arose out of the accountant's failure to properly protect its client. The situation here is no different. Plaintiffs allege not only that defendants failed to adequately advise them with respect to the tax strategy. They also claim that Proskauer pressured them into the scheme because, *at the outset*, Proskauer's paramount concern was preserving its lucrative arrangement with TDG, which presumably intended to continue to work with Proskauer to sell the scheme to other high net worth individuals and entities.

This Court has not disavowed *Mitschele*, as defendants contend. In *Carl v Cohen* (55 AD3d 478 [1st Dept 2008]), on which defendants rely, the plaintiff sought to elevate the defendant's failure to reveal an ethical conflict of interest from a malpractice claim into a fraud claim. However, *Carl* is substantively different from *Mitschele* and from the situation here, because there the attorney disclosed the conflict (*Carl v Cohen*, 2007 NY Slip Op 31665[U] [Sup Ct, NY County 2007]). Further, there was no allegation, as here, that the defendant was overwhelmingly motivated by the potential to profit from the adversely-situated party. Here, while defendants disclosed that they represented TDG on "other matters," they did not disclose that they were in business with TDG with respect to

selling the tax avoidance scheme and that helping TDG to sell the scheme was of primary importance. Further, the damages plaintiffs seek for the fraud and malpractice causes of action do not completely overlap with each other. Thus, the claims are not one and the same. The first amended complaint seeks far more money in damages under the fraud cause of action than under the malpractice cause of action. Indeed, Proskauer's narrow focus on what each claim seeks in damages ignores its own statement as to what the focus should be in determining whether claims are duplicative; that is, the essence of the claims. Here, the essences of the fraud and malpractice claims are sufficiently distinct from one another that the court properly did not invoke the duplicative claims doctrine.

The excessive fee and unjust enrichment claims are also not duplicative of the malpractice claim. The former is stated regardless of the quality of the work performed, so long as a plaintiff can reasonably allege that the fee bore no rational relationship to the product delivered (see *Ullmann-Schneider v Lacher & Lovell-Taylor, P.C.*, 121 AD3d 415, 416 [1st Dept 2014]). Here, plaintiffs did so, since they asserted that defendants collected a $425,000 fee for a "cookie cutter" legal opinion. By the same logic, the unjust enrichment claim, which is predicated on the excessiveness of the $425,000 fee, also properly survived the motion to dismiss.

We turn now to defendants' argument that, even if the fraud claim is not duplicative of the malpractice claim, it still must be dismissed for failure to state a cause of action. Specifically, defendants contend that plaintiffs cannot establish justifiable reliance because, as defendants characterize the allegations in the first amended complaint, plaintiffs were aware of the uncertain nature of the tax strategy when they agreed to participate in it. Defendants rely on *Shalam v KPMG LLP* (89 AD3d 155 [1st Dept 2011]), which also involved a failed tax avoidance scheme. In that case, this Court found that "the information that plaintiff *acknowledged* possessing at the time, along with information contained in documents in his possession, conclusively establish that he knew or should have known that he was participating in a scheme of doubtful legality" (89 AD3d at 157-158). This case is significantly different from *Shalam*. *Shalam* was decided on a motion for summary judgment, where the Court was permitted to look well beyond the allegations in the complaint. Thus, this Court was able to consider precisely what the plaintiff knew, and what he did not know, and was

able to conclude that the "[p]laintiff was presented with information sufficient to cause him to doubt the propriety of the [shelter] scheme for tax avoidance purposes, and willfully blinded himself to that information by failing to ask questions, pay attention to details, or read the documents he signed" (*id.* at 159). Here, by contrast, we are limited to what can reasonably be inferred from the four corners of the complaint, construing every possible reasonable inference in plaintiffs' favor. The pleading plainly alleges that, at the time plaintiffs agreed to participate in the TDG strategy, they were not armed with information sufficient to form their own opinion that the scheme might very well not pass IRS muster. To the contrary, the complaint alleges that defendants, who held themselves out as experts in tax law at the October 2000 meeting, led plaintiffs to believe, inter alia, that the strategy "*would* enable [p]laintiffs to legitimately and legally obviate the necessity to pay [t]axes otherwise arising in connection with a sale of J & J [s]hares"; that the "multi-step transactions *would* establish a legitimate and bona fide business and economic purpose and rationale for the tax treatment of" the strategy; and that it was "unlikely" that the IRS would challenge the strategy (emphases added). It was not until well after defendants allegedly made these representations, and acted on them by executing the recommended scheme, that they furnished the opinion letter stating that it was merely "more likely than not" that the strategy would be effective.

Defendants argue that the complaint concedes that plaintiffs knew at the October 2000 meeting that it was merely more likely than not that the IRS would not challenge the shelter scheme. They base this contention on the allegation in the first amended complaint that the opinion letter "reiterated and restated the representations made at the initial meeting that, for federal income tax purposes, it was 'more likely than not' " that the strategy would achieve results predicted by defendants. This reflects a misreading of the complaint. At most, that particular allegation establishes that at the October 2000 meeting defendants played down the likelihood that certain of the nuts and bolts in the complex process of executing the strategy would be recognized by the IRS as legitimate. It does not allege that defendants tempered their language at the meeting when presenting their opinions as to the chances the IRS would ultimately bless the overall strategy. Further, guided by the admonition, outlined above, that we are to construe the plead-

ing liberally while affording plaintiffs every possible favorable inference (*Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 326 [2002]), the first amended complaint should not be read in the inherently contradictory manner that defendants' interpretation requires; that is, that the complaint alleges that at the October 2000 meeting defendants told plaintiffs the tax strategy *would* succeed, while simultaneously representing that it was merely "more likely than not" that it would succeed.

Defendants further argue that *Shalam* stands for the proposition that a sophisticated party has a heightened burden in establishing fraud in the context of a tax avoidance scheme. Preliminarily, we note that the defendant in *Shalam* was not, like here, a law firm. That is a critical distinction. The sophisticated investor doctrine will, in applicable cases, require a party claiming fraud to establish that it "used due diligence and took affirmative steps to protect [itself] from misrepresentations by employing what means of verification were available at the time" (*VisionChina Media Inc. v Shareholder Representative Servs., LLC*, 109 AD3d 49, 57 [1st Dept 2013]). However, where the party relying on this doctrine is an attorney, and the sophisticated party is her client, this principle must give way to the notion that the

> "unique fiduciary reliance, stemming from people hiring attorneys to exercise professional judgment on a client's behalf—'giving counsel'—is imbued with ultimate trust and confidence (*see, Rosner v Paley*, 65 NY2d 736, 738; *Greene v Greene*, 56 NY2d 86, 92). *The attorney's obligations, therefore, transcend those prevailing in the commercial market place* (*compare, Meinhard v Salmon*, 249 NY 458, 463, 464). The duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interests over the lawyer's" (*Matter of Cooperman*, 83 NY2d 465, 472 [1994] [emphasis added]).

Moreover, this Court has stated that, where an attorney enters into a business transaction with a client whereby the two parties' interests may at some point diverge, the ethics rules place on the attorney the burden of obtaining the client's

consent, after full disclosure, "irrespective of the sophistication of the client" (*Forest Park Assoc. Ltd. Partnership v Kraus*, 175 AD2d 60, 62 [1st Dept 1991] [holding that law firm should have been disqualified from representing the plaintiff in a litigation, which was an entity in which 49 of the firm's partners were investors, where the firm had previously represented the defendant in connection with the transaction in which the entity was formed]; *accord Schlanger v Flaton*, 218 AD2d 597, 602-603 [1st Dept 1995]). Accordingly, defendants were required to place plaintiffs' interests above all else, without regard to their perceived pedigrees, fortunes or business savvy.

■ Indeed, the mere facts that plaintiffs were wealthy and could afford high-priced counsel are insufficient for us to draw the conclusion that, as a matter of law, they should have known that there was almost a 50% possibility that the tax strategy would not succeed. On this record, defendants cannot establish the specific backgrounds of plaintiffs and their familiarity with the tax code and IRS practices such that defendants can argue that plaintiffs were not justified in relying on defendants' advice. Ironically, this argument by defendants bolsters plaintiffs' excessive fee claim, since it invites the question why, if they were truly so sophisticated, they needed a $425,000 opinion from Proskauer to convince them to pursue the TDG/ Proskauer strategy. Further, it is worth noting that one of the things a sophisticated investor is presumed to know to do before entering a transaction is to consult with its attorney (*see Stuart Silver Assoc. v Baco Dev. Corp.*, 245 AD2d 96, 99 [1st Dept 1997]). That is precisely what plaintiffs did, and they were entitled to rely on defendants' advice.

■ Finally, plaintiffs' claim for punitive damages properly survived dismissal. Defendants' conduct is alleged to have been directed at a wide swath of clients, and the first amended complaint sufficiently alleges intentional and malicious treatment of those clients as well as a "wanton dishonesty as to imply a criminal indifference to civil obligations" (*Walker v Sheldon*, 10 NY2d 401, 405 [1961]). Indeed, although we offer no opinion regarding whether the particular scheme at issue was criminal in its manipulation of the tax laws, plaintiffs have demonstrated that similar tax avoidance schemes resulted in the indictments of some of their promoters. Accordingly, the demand for punitive damages is adequately stated. Defendants cite *Denenberg v Rosen* (71 AD3d 187 [1st Dept 2010], *lv dismissed* 14 NY3d 910 [2010]) for the purported proposition

that an attorney's involvement in promoting an unsuccessful tax avoidance scheme can never support a claim for punitive damages. However, this Court made no such declaration in that case. Nor did this Court find in *Denenberg* that the pension plan at issue was generally defective. Rather, it held that "it was the operation of plaintiff's *particular* plan that caused the problems with the IRS" (71 AD3d at 195 [emphasis added]).

Accordingly, the order of the Supreme Court, New York County (Lawrence K. Marks, J.), entered January 29, 2014, which, to the extent appealed from, denied, in part, defendants Proskauer Rose LLP and Jay Waxenberg's motion to dismiss plaintiffs' causes of action alleging fraud, excessive legal fee and unjust enrichment, denied that portion of their motion seeking dismissal of plaintiffs' demand for punitive damages based on the fraud claim, and granted that portion of their motion seeking dismissal of the cause of action for legal malpractice, should be affirmed, without costs. Plaintiffs' appeal from that portion of the order granting defendant Akselrad's motion seeking dismissal of the complaint as against him is unanimously withdrawn, without costs, in accordance with the stipulation of the parties dated April 24, 2015.

GONZALEZ, P.J., ACOSTA, MOSKOWITZ and DEGRASSE, JJ., concur.

Order, Supreme Court, New York County, entered January 29, 2014, to the extent appealed from, affirmed, without costs. Plaintiffs' appeal from order insofar as it granted defendant Akselrad's motion to dismiss the complaint as against him, withdrawn, without costs, pursuant to the parties' stipulation dated April 24, 2015.