NEOGENIX ONCOLOGY,
INC., Plaintiff,

v.

Peter GORDON; Mintz Levin Cohn Ferris Glovsky and Popeo P.C.; Nixon Peabody LLP; Daniel J. Scher; Harry Gurwitch; and Maie Lewis, as Representative of the Estate of Brian Lewis, Defendants.

No. 14–CV–4427 JFB AKT.

United States District Court,
E.D. New York.

Signed Sept. 30, 2015.

---

Brandon Lewis, Eric Madden, William Reid, Jeffrey Gross, Rachel Fleishman, Reid Collins & Tsai LLP, One Penn Plaza, New York, NY, for Plaintiff.

John Klotz, Bronx, NY, Howard Elman, Matalon Shwky Elman PLLC, Frederick Warder, Patterson, Belknap, Webb & Tyler LLP, Michael Rella, William Donnelly, Murphy & McGonigle, PC, New York, NY, Marian Rice, Meredith Belkin, L'Abbate, Balkan, Colavita & Contini, LLP, Garden City, NY, Daniel Seymour, Bank, Sheer, Seymour & Hashmall, White Plains, NY, for Defendants.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

This action arises from a company's efforts to raise capital by offering financial incentives to intermediaries who attracted investors. Plaintiff Neogenix Oncology, Inc., ("Neogenix," the "Company," or "plaintiff") brings this action against its former attorneys and executives, alleging that they knowingly permitted the Company to raise money by paying finders' fees to unlicensed brokers. According to Neogenix, this illegal fundraising program, known as the "Finder Fee Program" ("FFP"), ultimately drove the company into bankruptcy, because potential investors were scared off once the company's financial and legal exposure came to light.

Presently before the Court are separate motions to dismiss filed by defendants Peter Gordon; Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. ("Mintz"); Nixon Peabody LLP ("Nixon"); Daniel J. Scher; Harry Gurwitch; and Maie Lewis, as representative of the estate of Brian Lewis (collectively, "defendants"). All defen-

dants argue that plaintiff's claims are barred by the *in pari delicto* doctrine and the *Wagoner* rule because the conduct at issue is attributable to Neogenix and benefited the Company, and, therefore, plaintiff is precluded from bringing suit for harms caused by its own misdeeds. Defendants also argue that plaintiff has failed to adequately allege that their conduct caused plaintiff's eventual bankruptcy, because Neogenix made statements during the course of its bankruptcy that suggest its financial condition was caused by other problems in the Company, and the claims for damages related to the bankruptcy must, therefore, be denied. Defendant Mintz separately argues that plaintiff's claims against it for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty are barred on statute of limitations grounds and are duplicative of each other. Defendants Gurwitch and Lewis argue that plaintiff's claims against them for breach of fiduciary duty fail because plaintiff has not adequately pled that they owed a fiduciary duty to the Company, and that even if they did owe such a duty, their alleged conduct did not breach that duty or cause plaintiff damages. Defendant Scher, who became plaintiff's Chief Legal Officer ("CLO") in 2010, argues that plaintiff has failed to allege that he engaged in any misconduct to substantiate a legal malpractice claim. Finally, defendant Gordon, plaintiff's Chief Financial Officer ("CFO"), argues that plaintiff has failed to allege that he engaged in any misconduct.

For the following reasons, the motions are denied. In short, defendants' arguments all raise issues of fact that cannot be resolved in this particular case in the context of a motion to dismiss. For present purposes, it is sufficient that plaintiff has plausibly alleged that actions of Gordon in initiating and promoting the FFP were adverse to the Company's interests, and thus plaintiff's claims are not barred by

any defense based upon a theory of attribution. The Court also concludes that plaintiff has plausibly alleged that defendants' conduct contributing to the liabilities incurred by the FFP was a "but for" cause of the Company's bankruptcy-related damages. The Court also concludes that plaintiff has plausibly alleged that Mintz, after initially advising Gordon of the FFP's illegality, breached its fiduciary duty by intentionally failing to advise other Company officers or directors after Gordon moved forward with the FFP. Finally, the Court finds that plaintiff has plausibly alleged that the Company's other legal advisers (Nixon and Scher) committed malpractice by failing to advise the Company of the FFP's illegality, that Gurwitch and Lewis breached their fiduciary duties by failing to adequately advise the Company on the issues relating to the FFP due to their conflicts of interest, and that Gordon engaged in misconduct through his involvement in the FFP.

## I. BACKGROUND

The following facts are taken from the amended complaint, and are not findings of fact by the Court. Instead, the Court will assume these facts to be true and, for purposes of the pending motion to dismiss, will construe them in a light most favorable to plaintiff, the non-moving party.

According to the amended complaint, "Neogenix was a biotechnology company that developed diagnostic and therapeutic products for the early detection and treatment of cancers." (Am. Compl. ¶ 16.) Neogenix was incorporated in Maryland and headquartered in Great Neck, New York. (Id. ¶ 4.) In 2005, the Company embarked on a major initiative to raise capital, central to which was the FFP devised by Peter Gordon, the Company's CFO. (Id. ¶ 25–28.) Under the program, Neogenix paid commissions to individuals who brokered sales of the company's stock. (Id. ¶ 26.) Importantly, the FFP was not restricted to brokers who were licensed under state and federal laws; instead, the FFP enabled the Company to pay commissions to individuals regardless of their licensing status. (Id. ¶¶ 29–31.)

At the time Gordon initiated the FFP, Neogenix was represented by the law firm of Mintz, which served as outside general counsel to the Company. (Id. ¶ 35.) At the time of the FFP's inception, a Mintz attorney advised Gordon that the proposed plan was unlawful, stating: "Your draft provides for the payment of commissions to officers and employees who sell units. You cannot pay compensation to non-licensed intermediaries." (Id. ¶ 36.) Gordon did not convey this warning to other officers or directors of the Company, and the Company proceeded to raise significant funds through the FFP. (Id. ¶¶ 37–38). Specifically, Neogenix avers that "[b]y October 2011, Neogenix had compensated unlicensed finders millions of dollars in commissions for their securing tens of millions of dollars in investment capital." (Id. ¶ 32.) During that time, Mintz attorneys who participated in Board meetings where the FFP was discussed never notified the Company that the program permitted unlawful activity. (Id. ¶¶ 39–51.) Although Neogenix was aware of the FFP, the Company was not aware that paying commissions to unregistered brokers was unlawful. (Id. ¶ 29.) Among these unlicensed intermediaries receiving commissions for referrals via the FFP were friends of Gordon—Gurwitch, Lewis, and Squire—all of whom also happened to be members of the Company's Business Advisory Board, which was charged with advising the Company and its Board on business decisions and policies, including monitoring and oversight of the FFP.[1] (Id.

---

1. Lewis served on the Business Advisory Board until his death in November 2010.

¶¶ 94–98.) According to the amended complaint, Gordon also convinced Neogenix to hire Squire, Lewis, and Gurwitch and their respective companies (after they had been placed onto the Business Advisory Board) for various lucrative Company projects, including as financial advisors for fundraising and as investment banking service providers. (*Id.* ¶ 96.)

In 2008, the Mintz attorneys who handled Neogenix's representation left that firm to join Nixon, where they continued to represent Neogenix. (*Id.* ¶ 61.) Neogenix avers that "[a]s was the case with Mintz, Nixon was the Board's sole source of legal advice until the company hired in-house counsel in early 2010." (*Id.* ¶ 63.) Additionally, Neogenix asserts that

> [l]ike Mintz, Nixon had many other opportunities to notify Neogenix of the impropriety associated with paying commissions to unlicensed finders and the risks that the Finder Fee Program created for Neogenix. Like Mintz before it, Nixon regularly advised Neogenix regarding its efforts to raise capital during its tenure, and Nixon drafted each of the three [Private Placement Memoranda] issued during that time … And all discussed the Finder Fee Program without disclosing its impropriety or the risks it created for Neogenix.

(*Id.* ¶ 70.) In 2010, the company hired Scher to serve as CLO of Neogenix. (*Id.* ¶ 78.) Scher was involved in several Board meetings where the FFP was discussed, but never advised the company that it was unlawfully paying commissions to unlicensed brokers. (*Id.* ¶ 79.)

In 2011, Neogenix terminated its relationship with Nixon over a fee dispute. (*Id.* ¶ 81.) According to the complaint, Neogenix's new outside counsel immediately notified the Company that the FFP was unlawful. (*Id.* ¶ 82.) A few months later, while the company was conducting an internal investigation, the U.S. Securities and Exchange Commission ("SEC") initiated an investigation into Neogenix's FFP, which revealed that "over $35 million of investments in Neogenix had been procured through unlicensed finders who received improper commissions." (*Id.* ¶ 8384.) Complicating matters, these transactions were potentially voidable, which meant that the Company faced significant exposure to potential rescission claims from investors. (*Id.* ¶ 84.) The SEC inquiry, the internal investigation, and the uncertainty over the rescission liability (including a consultation with the SEC Office of the Chief Accountant) caused Neogenix to be unable to timely file its quarterly and annual financial statements with the SEC, including its third quarter 2011 Form 10–Q and its 2011 Form 10–K, forcing it to publicly explain that "the reason for these delays was the SEC Inquiry and the massive potential rescission exposure Neogenix faced." (*Id.* ¶¶ 86–88.) Neogenix alleges that these legal and financial difficulties were well-publicized, and, therefore, "[p]otential investors were alerted to these issues, which froze further additional investment in Neogenix during late 2011 and 2012." (*Id.* ¶ 88.)

The company's financial state worsened, and in 2012, Neogenix filed for bankruptcy in United States Bankruptcy Court for the District of Maryland. (*Id.* ¶ 4.) That proceeding is currently pending.

Plaintiff commenced this action on July 22, 2014. On October 20, 2014, plaintiff filed an amended complaint. Defendants filed motions to dismiss the amended complaint on December 22, 2014, and plaintiff filed an opposition to the motions on January 28, 2015. Defendants replied on Feb-

---

(Am. Compl. ¶ 94.) The claims against the estate of Squire were dismissed without prej-

udice on November 20, 2014. (*See* ECF No. 62.)

ruary 17, 2015, and the Court heard oral argument on February 23, 2015. Following the oral argument, plaintiff submitted a sur-reply on March 10, 2015, and defendants responded on March 17, 2015.

This matter is now fully submitted, and the Court has fully considered the submissions of the parties.

## II. Motion to Dismiss

### A. Standard of Review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 91 (2d Cir.2010) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal,* setting forth two principles for a district court to follow in deciding a motion to dismiss. 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). First, district courts must "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

### B. Discussion

Defendants argue that plaintiff's claims are barred because Gordon's conduct is attributable to Neogenix and benefited the Company through the funds raised by the FFP, and thus plaintiff is precluded from bringing suit for harms caused by its own misdeeds. Defendants also argue that plaintiff cannot plausibly allege that their conduct caused plaintiff's eventual bankruptcy, because Neogenix made statements during the course of its bankruptcy that suggest its financial condition was caused by other problems in the Company, and the claims for damages related to the bankruptcy must, therefore, be denied. Defendant Mintz separately argues that plaintiff's claims against it for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty are barred on statute of limitations grounds and are duplicative of each other. Defendants Gurwitch and Lewis argue that plaintiff's claims against them for breach of fiduciary duty fail because plaintiff has not adequately pled that they owed a fiduciary duty to the Company, and that even if they did owe such a duty, their alleged conduct did not breach that duty or cause plaintiff damages. Defendant Scher argues that plaintiff has failed to allege that he engaged in any misconduct to substantiate a legal malpractice claim. Finally, defendant Gordon argues that plaintiff has failed to allege that he engaged in any misconduct. The Court addresses each of these arguments in turn.

### 1. Defenses Based Upon Attribution

Defendants assert that plaintiff's claims are barred under two related, but distinct doctrines that bar a company from bring-

ing suit for actions taken by its own officers to advance the company's interests.

■ The first doctrine is the well-established defense of *in pari delicto*. As the Second Circuit has explained, "[t]he *in pari delicto* defense prohibits suits in which the plaintiff is as or more culpable than the defendant in the conduct forming the basis for the complaint." *UCAR Int'l, Inc. v. Union Carbide Corp.*, 119 Fed. Appx. 300, 301–02 (2d Cir.2004). In *Kirschner v. KPMG LLP*, the New York Court of Appeals emphasized the importance of the *in pari delicto* defense: "This principle has been wrought in the inmost texture of our common law for at least two centuries.... The doctrine survives because it serves important public policy purposes. First, denying judicial relief to an admitted wrongdoer deters illegality. Second, in pari delicto avoids entangling courts in disputes between wrongdoers." 15 N.Y.3d 446, 464, 912 N.Y.S.2d 508, 938 N.E.2d 941 (N.Y.2010) (internal quotation marks and citations omitted).

■ When the *in pari delicto* defense is asserted against a corporation, traditional agency principles will govern the analysis of whether the act of the corporation's agent is attributable to the principle. *Id.* at 465, 912 N.Y.S.2d 508, 938 N.E.2d 941. Here, there is no question that Gordon allegedly initiated the FFP as the Company's agent. Thus, his actions are presumptively imputed to Neogenix. *Deangelis v. Corzine (In re MF Global Holdings Inv. Litig.)*, 998 F.Supp.2d 157, 189 (S.D.N.Y.2014) ("The traditional principle that a corporation is liable for the acts of its agents and employees applies with full force to the *in pari delicto* analysis."). However, as *Kirschner* recognized, there is an exception to this principle, known as the adverse interest exception. *Kirschner*, 15 N.Y.3d at 465, 912 N.Y.S.2d 508, 938 N.E.2d 941. "To come within the exception, the agent must have *totally*

*abandoned* his principle's interest and be acting *entirely* for his own or another's purpose." *Id.* (citing *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784–85, 497 N.Y.S.2d 898, 488 N.E.2d 828 (N.Y.1985)) (emphasis in original). Here, plaintiff invokes the exception by arguing that Gordon's conduct did not benefit Neogenix in any way.

■ In addition to the *in pari delicto* defense, defendants also argue that plaintiff's claims are barred by the so-called "*Wagoner* rule," a prudential limitation on federal standing first articulated by the Second Circuit in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991). The *Wagoner* rule provides that bankruptcy trustees have "no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Teras Int'l Corp. v. Gimbel*, No. 13–CV–6788 (VEC), 2014 WL 7177972, at *4 (S.D.N.Y. Dec. 17, 2014) (citing *Bennett Funding Grp. v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp.)*, 336 F.3d 94, 99–100 (2d Cir.2003)). That is because "a claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 63 (2d Cir.2013) (quoting *Shearson Lehman Hutton*, 944 F.2d at 120.) Like the *in pari delicto* defense, the *Wagoner* rule depends upon imputation to the corporation according to traditional principles of agency law, and thus the *Wagoner* rule likewise admits of the adverse interest exception. *Teras Int'l Corp.*, 2014 WL 7177972, at *4–5; *see also Fox v. Picard*, 848 F.Supp.2d 469, 483 (S.D.N.Y.2012) ("The Wagoner Rule derives from the common law doctrine of *in pari delicto*.").

The parties agree that, in this case, the application of both *Wagoner* and *in pari*

*delicto* depends upon whether Gordon's actions can be imputed to Neogenix. This question requires the Court to resolve whether Gordon's conduct falls within the adverse interest exception to imputation. However, the wrinkle in this case is that the defendant law firms are based in different states, and plaintiff contends that the issue of attribution in this case is governed by different state laws for each of the defendants. Defendants counter that New York law should apply here, and urge the Court to hold that Gordon's conduct does not fall within New York's narrow adverse interest exception. Ordinarily, the Court would be required to engage in a conflict-of-laws analysis to determine which law should apply here. *See Okimoto v. Youngjun Cai,* No. 13 Civ. 4494(RMB), 2015 WL 3404334, at *3–4 (S.D.N.Y. May 21, 2015) (engaging in choice of law analysis for adverse imputation exception). However, the Court has determined that defendants are not entitled to dismissal because the pleadings withstand this defense even under its most robust form under New York law. For this reason, the Court need not decide, at this juncture, which law applies to the affirmative defenses that have been asserted here.

■ Under *Kirschner,* the adverse interest exception applies only when the agent is acting *"entirely* for his own or another's purpose." *Kirschner,* 15 N.Y.3d at 465, 912 N.Y.S.2d 508, 938 N.E.2d 941 (emphasis in original) (citing *Center,* 66 N.Y.2d at 784–85, 497 N.Y.S.2d 898, 488 N.E.2d 828). Thus, "if a corporation receives *any* benefit from the [misconduct], the adverse interest exception will not apply, even if the [misconduct] ultimately causes the corporation to suffer harm in the long term, and even where the insider intended to benefit himself at the corporation's expense." *Cobalt Multifamily Investors I, LLC v. Shapiro,* 857 F.Supp.2d 419, 428 (S.D.N.Y.2012) (emphasis in original) (citing *Kirschner,* 15 N.Y.3d at 468–69, 912 N.Y.S.2d 508, 938 N.E.2d 941). *Kirschner* itself noted that conduct that helps the company to "attract investors and customers and raise funds for corporate purposes" would not fall within the exception, because it benefits the company. *Kirschner,* 15 N.Y.3d at 468–69, 912 N.Y.S.2d 508, 938 N.E.2d 941. This principle holds true even where, as here, the conduct drives the company into bankruptcy. *Id.* at 468, 912 N.Y.S.2d 508, 938 N.E.2d 941.

■ Applying that standard here, the Court concludes that the allegations in the complaint fall within the adverse interest exception to imputation. For present purposes, it suffices that plaintiff has alleged that the decision to use unregistered finders, instead of brokers (and to conceal the unlawfulness of this decision from Neogenix) did not benefit plaintiff. Plaintiff avers that, because of Neogenix's viability as a promising investment, there was a strong market for Neogenix's stock, and the Company had no difficulty raising capital and selling shares to investors. (Am. Compl. ¶¶ 19–24.) Therefore, according to Neogenix, the incentives for brokers to sell stock would have been independently sufficient to raise capital, and the company did not need to similarly incentivize unregistered finders. (*Id.* ¶¶ 101–02.) Although defendants argue that Neogenix benefited from widening the pool of individuals who were pursuing investors, plaintiff avers that there would have been a similar pool of brokers had Gordon elected to use them instead of sharing commissions with unregistered finders, many of whom were his friends. (*Id.* ¶ 102.) To put this another way: assume, hypothetically, that there were a hundred individuals who, over the course of the years, facilitated the sale of Neogenix stock under the FFP. Further assume that fifty of these individuals were registered brokers, and fifty were unregis-

tered finders acting (unlawfully) as brokers. Plaintiff's point is that the company could easily have used an additional fifty brokers instead of using finders, and that these brokers would have received the same incentive to bring in investors, because the FFP offered equal commission rates to registered brokers and unregistered finders.[2] Moreover, the investors presumably were no more or less persuaded to buy Neogenix stock based upon the registration status of the intermediary. Under these circumstances, the decision to use finders instead of brokers did not benefit Neogenix in any way. Instead, this decision (and the decision to conceal the legal status of the program from the company) only benefited Gordon, insofar as it permitted him to share commissions with his friends and associates, who would otherwise not have been able to participate in a program that was limited to registered brokers. (*Id.* ¶ 99.)

Defendants may dispute this, but that is a question of proof, not plausibility.[3] Accepting, as it must, the facts as they are alleged in the amended complaint, the Court concludes that *in pari delicto* and *Wagoner* defenses are not apparent on the face of the pleadings, because the plausible allegations in the complaint fall within the adverse interest exception.

The Court recognizes that, under New York law, the adverse interest exception is carefully drawn and purposefully narrow. To that end, the Court emphasizes that it has not determined that plaintiff's claims will ultimately withstand the *in pari delicto* and *Wagoner* defenses. To the contrary, the defendants are free to raise these defenses in the context of a summary judgment motion at the conclusion of discovery. At that time, the facts developed in discovery will aid the Court in determining both the conflict-of-laws inquiry (based upon New York's contacts to the underlying dispute) and the affirmative defenses.

Thus, the Court denies the motion to dismiss based upon the *in pari delicto* and *Wagoner* defenses, without prejudice to defendants asserting these defenses at a later stage in the case.

### 2. Causation

■ Defendants also argue that Neogenix fails to plausibly allege that any of their alleged conduct or omissions was a "but for" cause of plaintiff's bankruptcy, and that therefore any claims seeking damages relating to plaintiff's bankruptcy must be dismissed. As set forth below, the Court disagrees.

**2.** Of course, this issue may appear in a different light after the parties develop a factual record. For example, it could be the case that the commission rate of the FFP was less desirable to brokers than it was to finders, if, for example, the registration status of brokers typically permitted them to command a higher commission rate than Neogenix was offering. If that were the case, then the FFP would have been more attractive to finders, and thus Gordon's conduct may have expanded the pool of intermediaries who were pursuing sales of the company's stock. This would have benefitted the company. However, the amended complaint does not give rise to any inference that brokers found the FFP any less desirable than finders did.

**3.** Defendants argue that the amended complaint acknowledges that more money was raised through finders than was raised through brokers. (*See, e.g.,* Nixon Mem., ECF No. 77, at 12.) However, the amended complaint does not provide any facts that suggest that there is any causal connection between the registration status of the intermediaries and the amount of investment funds they yielded. The fact that more funds were raised illegally does not give rise to an inference of causation. For example, it may well be the case that Neogenix simply used more finders than brokers because Gordon wished to direct commissions to finders he knew. Again, this is a fact-intensive issue that cannot be resolved based upon the pleadings.

 Defendants correctly state that, in order to satisfy the proximate cause element of its legal malpractice claims, plaintiff must prove that "but for the attorney's negligence, what would have been a favorable outcome was an unfavorable outcome." *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F.Supp.2d 203, 209 (S.D.N.Y. 2010) (citations and internal quotation marks omitted); *see also Brooks v. Lewin*, 21 A.D.3d 731, 800 N.Y.S.2d 695, 697 (2005) ("In order to establish proximate cause, a plaintiff must demonstrate that but for the attorney's negligence, she would have prevailed in the underlying matter or would not have sustained any ascertainable damages.") (citation omitted). The primary "outcome" at issue in these claims is plaintiff's bankruptcy;[4] therefore, plaintiff must adequately plead that but for the negligence of defendants, it would not have had to file for bankruptcy, thereby sustaining damages.[5] However, "it is not necessary to demonstrate *sole causation* in order to demonstrate proximate or but-for causation." *Smartix Int'l Corp. v. Garrubbo, Romankow & Capese, P.C.*, No. 06 Civ. 1501(JGK), 2009 WL 857467, at *4 (S.D.N.Y. Mar. 31, 2009) (emphasis added) (citing *Barnett v. Schwartz*, 47 A.D.3d 197, 848 N.Y.S.2d 663, 668 (2007)).

Here, plaintiff has alleged, *inter alia*, that during the years immediately following the inception of the FFP in 2004, the Company raised the substantial majority of its equity capital through other means, signifying that the FFP was not necessarily fundamental to its corporate viability. (Am. Compl. ¶ 45.) Plaintiff alleges, however, that over time the Company raised more and more money through the FFP, and by 2011, it had sold approximately 70% ($35 million) of its $50 million in outstanding stock via the FFP. (*Id.* ¶¶ 24, 32, 84.) Plaintiff alleges that the FFP's improprieties led to the internal investigation and SEC inquiry which: (1) caused the Company to realize it had incurred approximately $31 million in potential rescission liability due to the FFP-related sales; (2) led to a disagreement with the Company's auditors and the SEC over how to report the FFP-related liability, causing the Company to be unable to timely file its 2011 third quarter Form 10–Q or its 2011 Form 10–K. (*Id.* ¶¶ 83–90.) Plaintiff further alleges that "the SEC Inquiry and the magnitude of the subsequent uncovering of the Finder Fee Program's impropriety all played out in the public domain," causing the Company to be frozen out of the investment markets, and eventually leading to its filing for bankruptcy. (*Id.* ¶¶ 88–90.)

---

4. Although defendants here argue that plaintiff has failed to plausibly allege that their conduct caused Neogenix to declare bankruptcy, as a threshold matter, the Court notes that plaintiff has alleged injuries beyond those directly caused by the Company's bankruptcy, including attorneys' fees paid to Nixon and Mintz and damages associated with the SEC inquiry.

5. Plaintiff notes in its brief that, with respect to the breach of fiduciary duty claims against Gordon, Gurwitch, and Lewis, the lesser "substantial factor" test applies under New York law. (*See* Pl. Mem., ECF No. 83, at 35 (citing *Malmsteen v. Berdon, LLP*, 369 Fed.

Appx. 248, 251 (2d Cir.2010) ("Because [a]n action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of breach, there need not be 'but-for' causation between the breach and the asserted damages. The breach must merely be a substantial factor in causing the loss.") (internal quotation marks and citations omitted)).) Because the Court finds that plaintiff has plausibly alleged "but for" causation with respect to the conduct leading to plaintiff's bankruptcy at this stage of the litigation, the Court does not separately consider the "substantial factor" analysis.

Plaintiff alleges facts against each of the defendants with respect to their respective roles in allowing the FFP to incur these liabilities which purportedly crippled the Company, including: (1) Gordon allegedly ignored and concealed Mintz's advice in 2005 that the Company could not pay commissions to unlicensed finders (*id.* ¶¶ 35–37); (2) Mintz subsequently "intentionally concealed material facts from Neogenix" by failing to warn the Company of the FFP's illegality (*id.* ¶¶ 40–44); (3) Gurwitch and Lewis failed to adequately monitor and oversee the FFP in their role as members of the Business Advisory Board, and instead exploited the FFP to their benefit by receiving commissions themselves and other benefits despite the fact that they worked in the securities industry and were aware that they were not licensed brokers (*id.* ¶¶ 94–98, 165); (4) Nixon, when it became plaintiff's counsel in 2008 (at a time when plaintiff had only sold approximately $9 million in stock through unlicensed finders as opposed to the eventual total of $35 million), failed to alert the Company or its directors of the FFP's impropriety and Gordon's concealment of that impropriety, thereby causing the Company to incur another $26 million in illegal sales (*id.* ¶¶ 27, 37, 107–11); and (5) Scher similarly failed to alert the Company to the FFP's impropriety when he was hired in January 2010 and learned about the FFP, allowing the Company to continue the FFP and sell another $7.6 million in stock via unlicensed finders, and delaying the Company's ability to amelio-

rate the impact of the eventual SEC investigation and auditor issues. (*Id.* ¶¶ 78–79, 107–11.)

▉ In their motions, defendants point to statements made by Neogenix and its bankruptcy attorneys as part of its submissions to the Bankruptcy Court, which defendants argue demonstrate that plaintiff was unable to raise money in late 2011 and early 2012 to stave off bankruptcy for reasons other than the FFP-related rescission liability and the resultant SEC inquiry and inability to issue financial statements, including statements indicating that plaintiff's drug development was still in early stages and that outstanding stock options affected the ability to raise new equity capital. (*See, e.g.,* Nixon Mem., ECF No. 77, at 19–20.) Plaintiff asserted at oral argument that the statements with respect to the Company's drug development did not imply that the fundraising failed because the science was unproven, and that the statements regarding the dilutive stock options noted that many of the options were issued as compensation to unlicensed finders via the FFP. Even if the Court considered these statements, as discussed above, plaintiff is not required to allege that defendants' actions were the sole cause of its damages; indeed, plaintiff contends that regardless of the fundraising efforts discussed in the statements referenced by defendants, the Company was doomed in 2012 by the problems caused by the FFP. Moreover, it is clear that these are issues of fact inappropriate for resolution at the motion to dismiss stage.[6] *See*

---

**6.** Defendant Mintz, in making a similar argument, contends that plaintiff is judicially estopped from asserting that defendants' conduct caused the Company's bankruptcy by virtue of its purported representations to the Bankruptcy Court that its inability to raise new capital prior to filing was the result of factors other than rescission risk. (*See* Mintz Mem., ECF No. 73, at 12–15.) "The exact criteria for invoking judicial estoppel will vary based on specific factual contexts, but

judicial estoppel typically is appropriate when a party's position is clearly inconsistent with an earlier litigation position, the party persuaded a court to accept the earlier position, and the party will obtain a benefit from the new position. In this Circuit, estoppel only applies to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *In re Residential Capital, LLC,* 519 B.R. 606, 610 (S.D.N.Y.2014) (cita-

*Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir.2004) (whether the attorney's negligence was a "but for" cause of the plaintiff's damages is a question to be resolved by the factfinder) (citing *Zarin v. Reid & Priest*, 184 A.D.2d 385, 585 N.Y.S.2d 379, 381 (1992)). Based on the above, plaintiff has adequately pled that defendants' actions were a "but for" cause of its bankruptcy and the related losses. Therefore, defendants' motions are denied with respect to this issue.

### 3. Claims against Mintz

#### a. Statute of Limitations

Defendant Mintz argues that Neogenix's claims against it are barred by the three-year statute of limitations that governs claims for legal malpractice and breach of fiduciary duty. (Mintz Mem., ECF No. 73, at 18–22.) Mintz contends that plaintiff originally asserted Count IV as a claim for "Legal Malpractice and Breach of Fiduciary Duty" against Mintz for "negligence" and "deviations from the 'standard of care.'" (Mintz Reply, ECF No. 94, at 7.) Mintz alleges that plaintiff amended its complaint to recast the same conduct as a "Breach of Fiduciary Duty by Fraudulent Concealment" to avoid the three-year statute of limitations that would otherwise bar its claims. (*Id.*)

A claim of legal malpractice is subject to a three-year statute of limitations that begins to run on the "day an actionable injury occurs, even if the aggrieved party is then ignorant of the wrong or injury." *McCoy v. Feinman*, 99 N.Y.2d 295, 301, 755 N.Y.S.2d 693, 785 N.E.2d 714 (N.Y. 2002) (internal citations omitted). A breach of fiduciary claim generally has a three-year statute of limitations period, but has a six-year statute of limitations if premised on fraud. *See* CPLR 213(8);

214(4); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139, 879 N.Y.S.2d 355, 907 N.E.2d 268 (N.Y.2009).

▬ "To state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157, 165 (2003). Fraud may also be "predicated on acts of concealment where the defendant had a duty to disclose material information." *Id.* "Where there is a fiduciary relationship, such as between a director or officer and a corporation, the mere failure to disclose facts which one is required to disclose may constitute actual fraud, provided the fiduciary possesses the requisite intent to deceive." *Whitney Holdings, Ltd. v. Givotovsky*, 988 F.Supp. 732, 748 (S.D.N.Y.1997).

▬ A plaintiff cannot recast a malpractice claim as a claim for breach of fiduciary duty. If a claim for breach of fiduciary duty merely alleges a failure to utilize reasonable care or negligence, the three-year statute of limitations will apply. *See In re R.M. Kliment & Frances Halsband, Architects (McKinsey & Co., Inc.)*, 3 N.Y.3d 538, 541–43, 788 N.Y.S.2d 648, 821 N.E.2d 952 (N.Y.2004). However, if plaintiff alleges a breach of fiduciary duty through intentional actions, such allegations will not be considered malpractice claims and the six-year statute of limitations will apply. *See Johnson v. Proskauer Rose LLP*, 129 A.D.3d 59, 9 N.Y.S.3d 201, 209 (2015) (finding plaintiffs adequately alleged fraud where they alleged defendants pressured them into a tax avoidance scheme to preserve a lucra-

---

tions and internal quotation marks omitted). Similar to the causation issue, judicial estoppel is a fact-sensitive inquiry, and the Court at

this juncture cannot conclude that plaintiff's well-pleaded factual allegations are "clearly inconsistent" with its prior representation.

tive arrangement with a client); *Mitschele v. Schultz,* 36 A.D.3d 249, 826 N.Y.S.2d 14, 19 (2006) (finding plaintiff adequately pled fraud where defendants were alleged to have perpetrated a fraud from the initiation of their accounting services by failing to disclose their concern with protecting interests of plaintiff's employer). Here, plaintiff alleges that Mintz breached its fiduciary duty through intentional actions, namely, that Mintz's agent, Feigin, "deliberately chose to remain silent" regarding the FFP because he "intended Neogenix to rely on Mintz's silence so that he (and his firm) could continue to reap the significant legal fees" and maintain Neogenix as a client. (Am. Compl. ¶¶ 132–135.) Plaintiff further alleges that it relied on Mintz's silence resulting in significant potential rescission liability and requiring plaintiff to pay more than $1 million under the FFP. (*Id.* ¶ 136.) Given these allegations, plaintiff has adequately pled a plausible claim for breach of fiduciary duty against Mintz, which is governed by the six-year statute of limitations period and, thus, timely.

### b. Duplicative Claims

Defendant Mintz further alleges that plaintiff's claim for aiding and abetting a breach of fiduciary duty (Count 7) should be dismissed as duplicative of the breach of fiduciary duty claim (Count 4) because both claims are premised on the same alleged conduct—Mintz's alleged failure to repeat its prior legal advice to others at Neogenix besides Gordon—and seek the same relief. (Mintz Mem., ECF No. 73, at 24–25.)

■ The Court finds that plaintiff's claim for aiding and abetting a breach of fiduciary duty is not entirely duplicative of the breach of fiduciary duty and, thus, survives the motion to dismiss. Under New York law, courts will dismiss claims that are entirely duplicative when they are premised on the same conduct and seek the same relief. *See, e.g., MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.,* 701 F.Supp.2d 518, 532 (S.D.N.Y.2010). However, here, plaintiff pleads a different breach in Count 7 than in Count 4—that Mintz "knowingly participated in, encouraged, and substantially assisted" Gordon in breaching his fiduciary duty. (Am. Compl. ¶ 158.) In contrast, Count 4 focuses on Mintz's breach of fiduciary duty. Because the aiding and abetting claim is premised on different conduct than the breach of fiduciary duty claim, it cannot be dismissed on the grounds of duplicity. *See Balta v. Ayco Co., LP,* 626 F.Supp.2d 347, 361 (W.D.N.Y.2009) (permitting aiding and abetting claim to go forward where it alleged that defendant assisted trustee's alleged breach of fiduciary duties whereas other claims alleged fraud by defendant). Therefore, the Court declines to dismiss Count 7 for aiding and abetting a breach of fiduciary duty as duplicative of Count 4.

### 4. Claims Against Gurwitch and Lewis

■ Plaintiff alleges that Gurwitch and Lewis, as members of the Business Advisory Board, breached fiduciary duties they owed to Neogenix. "In order to sustain a claim of breach of fiduciary duty under New York law, [plaintiffs] must prove the existence of a fiduciary relationship, misconduct by [defendants], and damages directly caused by [defendants'] misconduct." [7] *Margrabe v. Sexter & Warmflash,*

---

7. Although the parties debate whether New York or Maryland law controls plaintiff's breach of fiduciary duty, the Court would reach the same conclusion under either Maryland or New York law. Though plaintiff suggests that there may potentially be a conflict

between New York and Maryland law regarding whether "New York imposes duties of oversight on corporate fiduciaries akin to those recognized in *In re Caremark Int'l Inc. Derivative Litigation,*" as explained below, the Court finds that under New York law, even in

P.C., 353 Fed.Appx. 547, 549 (2d Cir.2009) (citation and internal quotation marks omitted); *see also Rut v. Young Adult Inst., Inc.*, 74 A.D.3d 776, 901 N.Y.S.2d 715, 716 (2010). Gurwitch and Lewis move to dismiss Neogenix's claim for breach of fiduciary duty under Rule 12(b)(6) on the grounds that Neogenix failed to sufficiently plead that (1) they, as members of the Business Advisory Board, owed any fiduciary duty to Neogenix, (2) even if they owed a fiduciary duty to Neogenix, the conduct they are alleged to commit did not breach that duty, and (3) even if they were found to breach the fiduciary duty, that breach did not cause the damages Neogenix alleges. As explained below, the Court finds that plaintiff has adequately alleged each element of breach of fiduciary duty, and denies the motions to dismiss.

 a. Fiduciary Relationship

The determination of whether a fiduciary duty exists cannot be made "by recourse to rigid formulas." *Scott v. Dime Sav. Bank of N.Y., FSB*, 886 F.Supp. 1073, 1078 (S.D.N.Y.1995). In assessing whether a fiduciary relationship exists under New York law, a court must examine "whether one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first." *Teachers Ins. & Annuity Ass'n of Am. v. Wometco Enters., Inc.*, 833 F.Supp. 344, 349–50 (S.D.N.Y.1993). In other words, " '[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit

of another upon matters within the scope of the relation.' " [8] *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1987) (quoting Restatement (Second) of Torts § 874, cmt. a). "[D]etermining the existence of a fiduciary relationship requires a fact-specific inquiry...." *St. John's Univ., N.Y. v. Bolton*, 757 F.Supp.2d 144, 166 (E.D.N.Y.2010). As a result, a "claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)." *Abercrombie v. Andrew Coll.*, 438 F.Supp.2d 243, 274 (S.D.N.Y.2006)

New York law requires that a fiduciary relationship "exhibit the characteristics of 'de facto control and dominance.' " *Doe v. Roman Catholic Diocese of Rochester*, 12 N.Y.3d 764, 879 N.Y.S.2d 805, 907 N.E.2d 683, 683 (2009) (citation omitted). This means that a fiduciary relationship "exists only when a person reposes a high level of confidence and reliance in another, who thereby exercises control and dominance over him." *People ex rel. Cuomo v. Coventry First LLC*, 13 N.Y.3d 108, 886 N.Y.S.2d 671, 915 N.E.2d 616, 620 (2009). Here, the Court concludes that the complaint adequately alleges the existence of a fiduciary relationship between Neogenix and both Gurwitch and Lewis, in which Neogenix "reposed confidence" in Gurwitch and Lewis and "reasonably relied" on their "superior expertise or knowledge." *JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, 2009 WL 321222, at *9 (S.D.N.Y. Feb. 9, 2009) (internal quotations omitted). According to

the absence of the *Caremark* case, plaintiff has sufficiently pled breach of fiduciary duty claims against both Lewis and Gurwitch. (Pl. Mem., ECF No. 83, at 20 (citing *In re Caremark Int'l Inc. Derivative Litigation*, 698 A.2d 959, 967–71 (Del.Ch.1996).)) Accordingly, for the purposes of the present motion, the Court will assume that New York law controls.

**8.** The same is true under Maryland law. *See Lasater v. Guttmann*, 194 Md.App. 431, 456, 5 A.3d 79 (Md.Ct.Spec.App.2010) ("A fiduciary relationship ... involves a duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation.")

the amended complaint, Lewis and Gurwitch joined the Business Advisory Board in 2004; Lewis served until his death in November 2010, and Gurwitch served until at least January 2011. (Am. Compl. ¶ 94.) In compensation for their services, both received 25,000 shares of Neogenix stock and were paid at least $2,000 annually plus travel expenses. (*Id.* ¶ 94.) As two of the senior level executives serving on the Business Advisory Board, Gurwitch· and Lewis were allegedly responsible for "review[ing] company decisions and policies, including the Finder Fee Program" and "advis[ing] [Neogenix] on [company] strategy." (*Id.* ¶¶ 33, 95.) They were also allegedly charged with carrying out special projects, introducing Neogenix to potential partners and investors, and "advis[ing] them on market conditions in the biotechnology and pharmaceutical industry." (*Id.* ¶ 95.) Plaintiff further alleges that Lewis and Gurwitch "had influence over Neogenix's fundraising efforts; including the Finder Fee Program." (*Id.* ¶ 164.) According to the amended complaint, "[t]hrough their positions, each was charged with the obligation to advise Neogenix on company decisions, policies, and strategy," including "deciding how to fund the company and ensuring that the incentives offered to those who might seek out potential investors did not violate securities laws or otherwise expose Neogenix to massive potential rescission liability." (*Id.*) Plaintiff further alleges that Gurwitch, Lewis, and other members of the Business Advisory Board were given confidential company information in order to fulfill these duties, and were required to sign confidentially agreements (*id.* ¶ 95), which further supports a finding that plaintiff adequately pled the existence of a fiduciary relationship. *JPMorgan Chase Bank,* 2009 WL 321222, at *10.

At the motion to dismiss stage, accepting these allegations as true and drawing all reasonable inferences in plaintiff's favor, the Court concludes that Neogenix ·has adequately pled the existence of a fiduciary relationship between Neogenix and the defendants. The facts in the complaint suffice to "allege[ ] a relationship in which [Gurwitch and Lewis] served as [Neogenix's] adviser[s], in [ ] position[s] of extraordinary trust, and under circumstances in which [Neogenix] assumed, and may have been entitled to assume, that [they] would act with [Neogenix's] best interests in mind." *Id.; see also EBC I, Inc. v. Goldman Sachs & Co.,* 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26, 31 (2005) (finding a fiduciary relationship where plaintiff hired the defendant "to give it advice for the benefit of the company, and [defendant] thereby had a fiduciary obligation to disclose any conflict of interest concerning the pricing of the IPO"). Neogenix has set forth allegations that indicate that it relied on Gurwitch and Lewis's expertise and put complete trust and confidence in their guidance and advice—and, because of that, Gurwitch and Lewis, by serving on the Business Advisory Board, undertook "a relationship of higher trust." *Id.; see also St. John's Univ.,* 757 F.Supp.2d at 167 (stating that a fiduciary relationship exists when "a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge") (citation and internal quotation marks omitted). Notably, "a fiduciary relationship may be found in any case 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'" *JPMorgan Chase Bank,* 2009 WL 321222, at *9 (quoting *United Feature Syndicate Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 218 (S.D.N.Y.2002)). Plaintiff has set forth such allegations in this case and, accordingly, the Court finds that plaintiff has plausibly alleged that Gurwitch and Lewis had a fiduciary relationship with

Neogenix while they served on the Business Advisory Board.[9]

### b. Breach of Duty

■■■ The Court concludes that plaintiff also adequately pleads that Gurwitch and Lewis breached their fiduciary duties, *i.e.*, that they committed misconduct in the course of their relationship with Neogenix. Here, plaintiff alleges that that Lewis and Gurwitch breached their duties by "ensur[ing] that the Business Advisory Board did not audit or otherwise investigate the propriety of the Finder Fee Program that was lining their pockets or those of their companies" and also by "fail[ing] to implement or utilize a system to monitor, oversee, or otherwise investigate the propriety of Neogenix's incentive program." (Am. Compl. ¶ 165.) Plaintiff pleads that, although Gurwitch and Lewis "knew that Neogenix was paying transaction-based compensation to unlicensed finders, [neither] of them did anything about it." (*Id.* ¶ 164.) Despite this alleged knowledge, plaintiff asserts that defendants "never raise[d] questions about the Finder Fee Program's propriety or implement[ed] procedures to test its compliance with securities laws," because "[t]hey did not want anyone doubting that it was appropriate for them or their companies to receive the commissions that Neogenix was paying them." (*Id.* ¶ 165.) In addition,

plaintiff also alleges they both participated in "Gordon's side financial investment services firm, 1st U.S. Capital" and "improperly obtained and used Neogenix's confidential and proprietary information in connection with this side venture in derogation of their duties to Neogenix." (*Id.* ¶ 167.)

All of these alleged activities, if proven to be true, constitute a breach of Gurwitch and Lewis's fiduciary duties to Neogenix. Plaintiff alleges that Gurwitch and Lewis not only failed to act in the best interest of Neogenix, but also defied their duties of extraordinary confidence and trust towards Neogenix in order to benefit themselves and "lin[e] their pockets or those of their companies" and invest in 1st U.S. Capital. (*Id.* ¶¶ 165, 167.) These actions, if proven, would clearly indicate that both Gurwitch and Lewis had conflicts of interest and were engaging in self-dealing, actions that are forbidden under the well-established law of fiduciaries. *See Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 541 N.Y.S.2d 746, 539 N.E.2d 574, 576 (1989) (stating that the law of fiduciaries "bar[s] not only blatant self-dealing, but also require[es] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty"); *see also EBC I, Inc.*, 799 N.Y.S.2d 170, 832 N.E.2d at 31 (holding

---

9. Courts have found fiduciary relationships to exist between individuals under similar circumstances, and also under circumstances where there arguably was less confidence and reliance than the instant case. *See, e.g., Roni LLC v. Arfa*, 18 N.Y.3d 846, 847–49, 939 N.Y.S.2d 746, 963 N.E.2d 123 (N.Y.2011) (concluding that plaintiffs adequately pled a fiduciary relationship where "the promoter defendants planned the business venture, organized the limited liability companies, solicited their involvement[,] ... exercised control over the invested funds," and "represented to the foreign investors that they had 'particular experience and expertise' in the New York real estate market"); *EBC I, Inc.*, 799

N.Y.S.2d 170, 832 N.E.2d at 31 (finding that the plaintiff alleged sufficient fiduciary relationship with underwriter to survive motion to dismiss where plaintiff "allege[d] an advisory relationship that was independent of the underwriting agreement" in which plaintiff "was induced to and did repose confidence in [defendants'] knowledge and expertise to advise it as to a fair IPO price and engage in honest dealings with [plaintiff's] best interest in mind."); *Precision Glass Tinting, Inc. v. Long*, 293 A.D.2d 594, 740 N.Y.S.2d 138, 139 (2002) ("It is well established that a real estate broker is a fiduciary with a duty of loyalty and an obligation to act in the best interests of the principal.").

that plaintiff had sufficiently alleged that Goldman Sachs breached its fiduciary duty by failing to disclose that it had a financial incentive to set a lower price for its client's IPO). " '[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect.' " *Drucker v. Mige Associates II*, 225 A.D.2d 427, 639 N.Y.S.2d 365, 365 (1996) (quoting *Birnbaum*, 541 N.Y.S.2d 746, 539 N.E.2d at 576.) In this case, plaintiff has alleged facts that would support a plausible claim that Gurwitch and Lewis breached their duty of "undivided and undiluted loyalty" to Neogenix. Accordingly, the Court finds that plaintiff sufficiently pled that the defendants breached their fiduciary duty.

### c. Damages

Finally, plaintiff must plead that its damages were directly caused by Gurwitch and Lewis's misconduct. The Court concludes that Neogenix has adequately alleged that Gurwitch and Lewis's misconduct, namely, failing to "safeguard against internal threats to the business strategies being employed, including those arising in connection with the company's fundraising methods" (Am. Compl. ¶ 164), caused plaintiffs to improperly pay finders fees, incur the costs related to the SEC Inquiry and the Bankruptcy Case, and the loss of Neogenix's value. (*Id.* ¶ 168.)

Accordingly, Gurwitch and Lewis's motions to dismiss the plaintiff's claim for breach of fiduciary duty are denied.

### 5. Claims Against Scher

Defendant Scher argues that the complaint fails to state a claim because it does not plausibly allege that he engaged in any misconduct. Specifically, Scher argues that, although plaintiff generally alleges that he should have known that the FFP was improper and would expose Neogenix to potential rescission liability and the threat of regulatory action, the amended complaint fails to allege that Scher had any reason to doubt the lawfulness of the FFP, which had existed for seven years by the time he became CLO. (Scher Mem., ECF No. 71–8, at 15–16.) Scher further argues that plaintiff's claim for breach of fiduciary duty is duplicative of its claim for malpractice and, thus, should be dismissed. (*Id.* at 16.)

After reviewing the allegations, the Court concludes that plaintiff plausibly alleges a malpractice claim against Scher. Under New York law, the elements of a malpractice claim are "(1) the negligence of the attorney; (2) that the negligence was the proximate cause of the loss sustained; and (3) proof of actual damages." *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 56 A.D.3d 1, 865 N.Y.S.2d 14, 22 (2008). The amended complaint plainly alleges that Scher knew that Neogenix's FFP compensated unlicensed finders and either "knew or should have known that this practice was improper and would expose Neogenix to significant potential rescission liability and the threat of regulatory action" but never advised Neogenix to stop paying commissions to unlicensed finders or of the risks of continuing to pay the commissions. (Am. Compl. ¶ 153.) In particular, the amended complaint alleges that Scher was present at ten meetings between January 19, 2010, and February 24, 2011, where fundraising and the FFP were discussed, and he reviewed several of the company's SEC filings during his tenure that disclosed the amount of transaction-based compensation that Neogenix paid to finders, yet, never raised any questions regarding the propriety of the program. (*Id.* ¶ 79.) Plaintiff further alleges that Neogenix suffered damages as a result of Scher's malpractice in the form of "improperly paid finder fees, the costs related to the SEC Inquiry, the costs of the Bankruptcy Case, and the loss of substantially all of Neogenix's value." (*Id.* ¶ 54.) Given

these allegations, plaintiff has certainly pled a plausible claim for malpractice. *See In re World Health Alternatives, Inc.*, 385 B.R. 576, 598 (Bankr.D.Del.2008) (denying motion to dismiss where plaintiff alleged that attorney defendant failed to provide oversight or advice that would have prevented company from submitting SEC filings that contained material misrepresentations, attorney was aware of wrongdoing but failed to act, and as a result, company suffered damages). Therefore, the Court concludes that plaintiff has plausibly alleged a claim for legal malpractice.

■■■■■ With respect to Scher's argument that the breach of fiduciary duty claim is duplicative of the malpractice claim and should be dismissed, the Court finds that plaintiff's claim for breach of fiduciary duty is not entirely duplicative of the legal malpractice claim and, thus, survives the motion to dismiss.[10] *See Ulico Cas. Co.*, 865 N.Y.S.2d at 20–21 (denying summary judgment on breach of fiduciary claim where it related to defendant's actions in helping set up a competing business but malpractice claim related to handling of claims as plaintiff's claims counsel); *Ciocca v. Neff*, No. 02 Civ. 5067(LTS)(HBP), 2005 WL 1473819, at *6

(S.D.N.Y. June 22, 2005) (denying summary judgment on breach of fiduciary claim where it was premised on demand for payment of a debt not at issue in malpractice claim). Under New York law, where a breach of fiduciary duty claim is "premised on the same facts and seeking the identical relief sought in the legal malpractice cause of action," it should be dismissed for redundancy. *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 10 A.D.3d 267, 780 N.Y.S.2d 593, 596 (2004). Accordingly, had plaintiff's claims for breach of fiduciary duty been merely duplicative of its claims for legal malpractice, such claims could not survive a motion to dismiss. However, plaintiff pleads an additional breach in its breach of fiduciary claim—that Scher was a participant in Gordon's "side financial investment services firm, 1st U.S. Capital" and "improperly obtained and used Neogenix's confidential and proprietary information in connection with this side venture in derogation of [his] duties to Neogenix." (Am. Compl. ¶ 167.) Plaintiff further alleges that Scher "continued to share Neogenix's private network and shareholder lists and contact information with Gordon well af-

---

**10.** Plaintiff contends that Maryland law should govern the breach of fiduciary duty claim because Neogenix is a Maryland corporation. (Pl. Mem., ECF No. 83, at 17–18.) Defendant Scher argues that New York law should govern this claim. (Def. Scher Reply at 4.) Regardless of which state's law would apply to the breach of fiduciary duty claim, there is no substantive difference in how the business judgment rule is applied. As Scher notes, both Maryland and New York courts allow corporate officers as well as directors to rely upon the business judgment rule. *See, e.g.*, N.Y. Bus. Corp. § 715(h); *Tackney v. U.S. Naval Acad. Alumni Ass'n, Inc.*, 408 Md. 700, 971 A.2d 309, 316 (2009) ("The business judgment rule insulates business decisions from judicial review absent a showing that the officers acted fraudulently or in bad faith.") (citation omitted). However, "[t]he business judg-

ment rule will not protect a decision that was the product of fraud, self-dealing, or bad faith." *Patrick v. Allen*, 355 F.Supp.2d 704, 710 (S.D.N.Y.2005) (citing *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 1000–01 (1979)); *Freer v. Mayer*, 223 A.D.2d 667, 637 N.Y.S.2d 425, 426 (1996); *Jones v. Surrey Coop. Apartments, Inc.*, 263 A.D.2d 33, 700 N.Y.S.2d 118, 121 (1999). Further, "[p]re-discovery dismissal of pleadings in the name of the business judgment rule is inappropriate where those pleadings suggest that the directors did not act in good faith." *Ackerman v. 305 E. 40th Owners Corp.*, 189 A.D.2d 665, 592 N.Y.S.2d 365, 367 (1993); *see also Patrick*, 355 F.Supp.2d at 711 (same). Accordingly, at this stage of the litigation, this Court cannot conclude that the business judgment rule protects Scher.

ter the company asked Gordon to resign." (*Id.*) Such allegations, if true, would certainly support a plausible claim for breach of the duty of loyalty. *See KatiRoll Co., Inc. v. Kati Junction, Inc.,* 33 F.Supp.3d 359, 371 (S.D.N.Y.2014) (denying motion to dismiss breach of duty of loyalty claim where plaintiff alleged that employees disclosed trade secrets or confidential and proprietary information to a competitor); *Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.,* 515 F.Supp.2d 298, 312–13 (N.D.N.Y.2007) (denying motion to dismiss breach of loyalty and fiduciary duty claims where plaintiff alleged that defendants, while plaintiff's employees, engaged in negotiations with current and prospective clients to establish a competing business). Accordingly, because the allegations underlying plaintiff's breach of fiduciary duty claim are not entirely duplicative and would constitute a plausible claim if true, the breach of fiduciary duty claim against Scher should not be dismissed.

### 6. Claims Against Gordon

Defendant Gordon argues that the complaint fails to state a claim, because it does not plausibly allege that he engaged in any misconduct. Specifically, Gordon argues that it is only unlawful to pay fees to finders if they act as brokers, but are unlicensed to do so.[11] (Gordon Mem., ECF No. 68–1, at 4.) From this, Gordon argues that the complaint fails to allege that the finders who were paid commissions by Neogenix had acted as brokers while they functioned as intermediaries for the sale of Neogenix stock.

█ The Court disagrees. The amended complaint plainly states that the program permitted incentive payments to finders who were not licensed as brokers, but who nevertheless received commis-

sions. Under Section 15(a) of the Securities Act, brokers must be registered with the U.S. Securities and Exchange Commission. 15 U.S.C. § 78o(a)(1). The Act defines the term "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). Among the many factors courts consider when determining whether a finder has acted as a broker, the receipt of transaction-based compensation—usually, in the form of commissions—is significant. *SEC v. Martino,* 255 F.Supp.2d 268, 283 (S.D.N.Y. 2003) (collecting cases), *remanded on other grounds,* 94 Fed.Appx. 871 (2d Cir.2004). Gordon cites *S.E.C. v. Kramer,* 778 F.Supp.2d 1320, 1334 (M.D.Fla.2011), for the proposition that a finder who receives commissions is not, in all circumstances, required to register as a broker. However, as plaintiff points out, that same case noted that transaction-based compensation is one of the "hallmarks" of a broker. *Id.* (citation omitted). Moreover, that case held that the SEC had failed to meet its considerable burden to prove that the defendant had acted as an unregistered broker; that standard is, of course, much different from plaintiff's modest pleading burden here.

The amended complaint plainly alleges that Neogenix paid commissions to individuals who facilitated the sale of the Company's stock, and that many of those individuals were not registered brokers. (Am. Compl. ¶ 26 ("Gordon had Neogenix pay commissions to anyone who brokered a sale of Neogenix stock, regardless of whether those persons were registered with the [SEC].... In other words, the Finder Fee Program financially rewarded both licensed and unlicensed finders who secured investment in the company.").) In any event, the question here is not wheth-

---

**11.** For the purposes of these motions, no other defendant has disputed the allegation that

the Company's payments to finders were unlawful.

er *every* unregistered finder who received a commission from Neogenix acted as a broker. Instead, plaintiff's cause of action arises from the fact that the program permitted unlawful finder-fee arrangements, which in fact occurred. Therefore, the Court concludes that plaintiff has plausibly alleged that Neogenix paid commissions to unregistered brokers, in violation of securities laws.

To the extent that Gordon makes other arguments as to why the causes of action against him cannot survive a motion to dismiss, the Court also finds those arguments unpersuasive. In particular, Gordon suggests that Count 3 should be dismissed because it inadequately alleges scienter under Rule 9(b) of the Federal Rules of Civil Procedure. However, the Court disagrees. The amended complaint plausibly and adequately alleges under Rule 9(b) that Gordon intentionally concealed from the Board the warnings from counsel advising of material risks posed by the FFP, and that he benefited financially from his friends' unlicensed brokering. (*See* Am. Compl. ¶¶ 36, 91–92, 94, 97–98, 107–108.) Thus, the amended complaint adequately alleges scienter by Gordon with respect to Count 3. In addition, contrary to Gordon's argument in his reply, there is no basis at the motion to dismiss juncture to dismiss Count 2 simply because Gordon asserts in a conclusory fashion that his Separation Agreement is an accord and satisfaction of the claims against him in Count 2. In short, Gordon has failed to raise any sufficient grounds for dismissal at this stage of the case.

### III. CONCLUSION

For the reasons set forth herein, the motions to dismiss are denied.

SO ORDERED.